**Paul HUBERT, Appellant,**

v.

**STATE of Alaska, Appellee.**

**Nos. 4541, 4542.**

Court of Appeals of Alaska.

Dec. 24, 1981.

---

Phillip Paul Weidner, Drathman & Weidner, Anchorage, for appellant.

Charles M. Merriner, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

## OPINION

Before BRYNER, C. J., and COATS and SINGLETON, JJ.

BRYNER, Chief Judge.

Paul Hubert was convicted in a non-jury trial of receiving and concealing stolen property valued in excess of $250, in violation of former AS 11.20.350(a). Evidence introduced against Hubert included a number of items of stolen property seized in the course of a search of Hubert's apartment conducted by police officers, as well as certain incriminating statements made by Hubert following his arrest. Prior to trial, Hubert filed a timely motion to suppress this evidence, which was denied by the superior court. Hubert was additionally charged, under AS 17.12.010 and 17.10.010, with possession of cocaine and possession with intent to distribute marijuana; these charges arose from the same investigation and search which led to Hubert's conviction of receiving and concealing stolen property. The superior court indicated that its denial of the suppression motion made by Hubert in the case involving receiving and concealing stolen property would govern any suppression motion raised by Hubert as to the drug charges pending against him. Hubert thereupon entered a negotiated plea of *nolo contendere* to the drug charges, reserving his right to challenge the court's suppression ruling on appeal; the state stipulated that the same suppression questions raised in the receiving and concealing case would be dispositive of the drug charges.[1]

---

1. Hubert's appeal from his conviction on the drug charges is thus brought pursuant to *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974), and ·*Oveson v. Municipality of Anchorage*, 574 P.2d 801, 802 n.4 (Alaska 1978).

Hubert was subsequently sentenced on his conviction of receiving and concealing stolen property and on his plea to the drug charges, receiving an aggregate sentence of three-years' imprisonment, with 16 months suspended. This consolidated appeal followed.

A summary of the facts relating to the search of Hubert's apartment and his subsequent arrest will facilitate disposition of the issues raised in this appeal.[2] On the evening of February 20, 1978, Investigator James Grimes of the Alaska State Troopers was assigned to investigate the burglary of an Anchorage home in which a number of valuable fur rugs, among other items, were stolen. Investigation on the evening of the break-in quickly led to discovery of one of the young burglars, who confessed his participation and named his two companions. A small amount of stolen property was recovered. Officers contacted one of the two persons named, who also confessed and confirmed participation of the third person involved in the burglary, a young man named Jim Lockman. That same evening, Lockman was interviewed at his home, in the presence of his father, by Investigator Grimes.

In the course of the interview, Lockman confessed to Grimes and told him that, earlier that evening, he had taken the stolen furs to an apartment in Anchorage and traded them for a pound of marijuana. The person to whom the furs were traded was known by Lockman only as "Paul." Lockman said he believed he could identify Paul and described him as a young Caucasian male, of medium height, with sandy-colored hair. Although Lockman did not know the precise address, he informed Grimes that Paul's apartment was in a large, multi-apartment complex located on the south side of 26th Avenue, between Arctic Road and Minnesota Boulevard. He stated that the building had a single front entrance with a security (buzzer-operated) door, and doors at both ends on the ground floor. Lockman informed Grimes that he had either entered or exited through one of the side doors. Lockman also told Grimes that Paul's apartment was on the second floor of the building, on the side of the hall opposite (south of) 26th Avenue, in approximately the middle of the hallway. A detailed description of the interior of the apartment was given to Grimes by Lockman, and Lockman said that, when he traded the stolen furs to Paul for marijuana, he observed a large quantity of marijuana stored in either a footlocker or a big suitcase in the livingroom of the apartment. Lockman told Grimes that he believed that Paul was planning to move out of the apartment the next day.

---

2. In the appellant's brief, Hubert relied exclusively upon the transcript of the suppression hearing for his statement of facts. The state, on the other hand, relied extensively in its brief on facts elicited before the grand jury and at trial. The state's reliance on evidence brought out before the grand jury is, without question, appropriate, since a full transcript of Hubert's grand jury proceedings was attached to the response to Hubert's omnibus motions filed by the state in the superior court.

A separate issue exists as to the propriety of using evidence presented at trial to support the superior court's ruling denying Hubert's suppression motion. A cogent analysis of this issue was presented by the state in a supplemental brief filed at the request of this court. Although the issue has not previously been addressed in Alaska, it appears to be well settled under federal case law that evidence presented at trial may be considered on appeal to uphold the ruling of a trial court on a suppression issue. *See, e.g., Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69

L.Ed. 543, 555 (1925); *United States v. Canieso*, 470 F.2d 1224, 1226 (2nd Cir. 1972). A split of authority exists on the issue among state courts, but the prevalent, and better reasoned cases follow the federal rule. *See, e.g., State v. Intogna*, 101 Ariz. 275, 419 P.2d 59, 63 (1966); *State v. Crowder*, 613 P.2d 909, 914 (Hawaii 1980); *State v. Martinez*, 94 N.M. 436, 612 P.2d 228, 231 (1980); and *Commonwealth v. Kaschik*, 235 Pa.Super. 388, 344 A.2d 519, 524 n.7 (1975).

In the present case, evidence relevant to the issue of suppression that was brought out exclusively at trial is limited to a number of facts which are generally not disputed and which, while helpful, would not be dispositive. We believe the federal rule allowing consideration of the full record, including testimony at trial, to be a sound one; under the circumstances of the present case we conclude that it is appropriate to consider the issues raised in this appeal in light of the entire factual record, including relevant testimony presented at trial.

At about midnight, Grimes drove Lockman to the vicinity of Paul's apartment. In the dark, Lockman was able to point out a large apartment house on the south side of 26th Avenue as the one in which he "thought" Paul lived. Grimes then drove Lockman to the Anchorage jail and formally booked him into custody. The booking process was completed at approximately 3:30 a. m., February 21.

At about 8:00 a. m. the same morning, Investigator Grimes, assisted by Trooper Leo Brandlen, returned to the building Lockman had pointed out. They could find no "Paul" on the building's mailboxes and were unable to locate the apartment manager. They further observed that the building had two main entrances in front and no side doors on the ground floor. Grimes and Brandlen then went to the apartment building next door, three to four hundred yards away, which was of similar size, construction and general appearance. The building next door was the only other large apartment building on the south side of 26th Avenue between Arctic and Minnesota. Upon inspection of this building, the officers noted that it had a single, security entrance in front, and two side doors. As someone entered or left the front doorway, the officers walked in. The testimony of Investigator Grimes, both at the suppression hearing and before the grand jury, indicates that Grimes and Brandlen immediately went to the apartment of the building manager, whom they contacted after knocking on her door. After identifying themselves, Grimes and Brandlen ascertained from the manager that Paul Hubert was the only tenant named Paul renting an apartment on the second floor; the manager said that Hubert lived in apartment 215 C. The troopers obtained permission from the manager to use her phone and contacted the Alaska State Trooper dispatcher, who ran a records check on the name Paul Hubert and confirmed, by Hubert's driver's license record, that he was twenty-two years of age.

At this time Grimes and Brandlen saw a young man come into the building and enter apartment 215 C. The officers passed by that apartment immediately after the man entered, and they smelled an odor of burning marijuana at the doorway. The entrance to the apartment was approximately in the middle of the second floor hallway on the south side; its location thus correspondended with the description given by Lockman.

After passing by the apartment, the officers exited the building. Grimes left to return to Trooper headquarters in order to assemble a photo line-up including Paul Hubert, which he planned to show to Jim Lockman; it was his intent to apply for a search warrant for Hubert's apartment if Lockman identified Hubert. Before leaving, Grimes instructed Brandlen to keep watch outside the apartment building.

Sometime after Grimes departed, Brandlen saw the young man who had previously entered 215 C leave the building and get into a car parked nearby. Shortly thereafter, another young man carrying a large suitcase proceeded to the same car, placed the suitcase in the car's trunk, and got in on the passenger side. This second young man was a Caucasian of medium height with sandy hair. Brandlen immediately radioed his observations to Grimes, who instructed him to detain the two men until he returned, saying he would start back immediately. Brandlen also ran a license check on the car occupied by the two men and determined that it was registered to a man with the last name Hubert, although the first name was not Paul.

As the men's car began to back out of its space, Brandlen moved his police car to block its exit. He walked over to the car, showed his badge and requested identification from the two men. Both produced identification; the driver was Arthur Dickenson and the passenger, Paul Hubert. Officer Brandlen explained to Hubert and Dickenson that they were being detained for questioning in regard to receiving property stolen in a recent burglary and informed them that they would have to wait until the senior investigating officer arrived shortly. He instructed them to repark their

car and wait with him in the police car. They complied without objection.

Once Hubert and Dickenson were seated in the police car, Brandlen informed both men of their *Miranda* rights. Although some discussion occurred between Brandlen and the two men, he did not question them, but stated that he was not as familiar with the case as the investigating officer who was on his way. In an affidavit submitted to the superior court in support of his motion to suppress, Hubert claimed that Trooper Brandlen implied that Investigator Grimes had obtained a search warrant for Hubert's apartment and urged Hubert to consent to a search. However, Brandlen's testimony at the suppression hearing below contradicted this assertion; the testimony of Arthur Dickenson, who was also a witness at the suppression hearing, tended to corroborate Brandlen's version.

Within ten to fifteen minutes of Brandlen's initial contact with the two men, Investigator Grimes arrived, identified himself, and asked the young men if they understood their rights. Both answered yes. Grimes explained that he was investigating a report that there might be stolen property and drugs in Hubert's apartment, and he recounted the information given to him by Lockman. According to Grimes' testimony, he did not ask Hubert to consent to a search of his apartment. Rather, Hubert "stated that it seemed liked I [Grimes] knew everything anyway and that he would let us go ahead and search his apartment." [3]

After Hubert agreed to the search, the troopers accompanied him and Dickenson to his apartment. There, Investigator Grimes went over a standard consent to search form with Hubert, and Hubert signed it.[4] Thereafter, the furs stolen in the burglary of the prior evening were seized from Hubert's livingroom, where they were in plain view. A search of the apartment also yielded approximately 30 pounds of marijuana, some hashish oil and a small quantity of cocaine. Numerous other items suspected of being stolen were also seized.[5]

After the search, Hubert was formally arrested and taken to the police station. Within two or three hours of his arrest, Hubert made a tape-recorded statement to Investigator Grimes. Although the statement was to some extent evasive and equivocal, it contained damaging admissions, both with respect to receiving and concealing goods known by Hubert to have been stolen and possession and distribution of drugs by Hubert. Portions of the state-

---

**3.** Hubert's affidavit is inconsistent with testimony in the record. Hubert claimed that he had smoked a considerable amount of marijuana and taken two quaaludes, which rendered him intoxicated and prevented him from understanding what was going on. He also claimed that Grimes stated that a warrant would definitely be issued if Hubert did not consent to a search. Thus, Hubert asserted that he consented to a search only because he thought he had no choice. The testimony of Investigator Grimes, however, indicates that Hubert appeared to be fully aware of the situation, was in control of his mental faculties, and responded rationally. Furthermore, while Grimes explained to Hubert that he intended to seek a warrant if Lockman could identify Hubert, Grimes made it clear that no identification had yet been obtained and expressly told Hubert that he could not be certain a warrant would be issued even if Lockman made an identification. Grimes' testimony is corroborated in the record by the testimony of both Brandlen and Dickenson. These disputed factual issues must be deemed to have been resolved in favor of the state, which prevailed below.

**4.** A discrepancy in evidence is also present as to whether Hubert knowingly and intelligently executed the consent to search form. Hubert's affidavit avers that he was too intoxicated to understand the rights stated therein and that he understood the consent form to authorize a search only for stolen property, not for drugs. On its face, the consent form contains no limitations on the scope of the search to be conducted. Grimes testified that he carefully read the rights stated on the form, one at a time, asked Hubert after reading each right if he understood it, and in all instances received an affirmative response. This process, according to Grimes, consumed about three minutes. Again, the factual dispute must be resolved favorably to the state.

**5.** Trooper Brandlen also searched, with Dickenson's consent, the suitcase Hubert had put into the car's trunk. More marijuana was found in the suitcase, but that marijuana did not form the basis for any charge against Hubert; the validity of the suitcase search is thus not in issue.

ment were used in evidence against Hubert at his trial for receiving and concealing stolen property.

■ We must assess Hubert's arguments on appeal in light of the circumstances detailed above. Two preliminary observations are appropriate. First, the superior court, in ruling on Hubert's suppression motions, made specific findings favorable to the state on several factual issues as to which the evidence was in conflict. Where findings by the trial court as to contested factual issues are supported by substantial evidence in the record, we are bound to accept them for the purpose of determining the validity of the superior court's refusal to suppress evidence; Hubert is not entitled to reexamination of issues of credibility on appeal unless the superior court's factual determinations were clearly erroneous. *Chilton v. State*, 611 P.2d 53, 55 (Alaska 1980); *State v. Kaatz*, 572 P.2d 775, 781–82 (Alaska 1977). Second, as to disputed factual issues which were not expressly resolved by findings of the superior court, it is well established that we must view the evidence in the record in the light most favorable to the prevailing party, here the state. *Stumbaugh v. State*, 599 P.2d 166, 173 n.15 (Alaska 1979).

We consider initially Hubert's contention that the non-consensual entry of Officers Grimes and Brandlen through the security door into his apartment building amounts to an unlawful search requiring suppression of the observations made by the officers inside the building, as well as evidence acquired as a result of those observations. The question presented is whether a tenant in a multi-apartment building that is protected by security doors has a reasonable expectation of privacy from police intrusion into corridors and other common areas of the building.

There are no Alaska cases directly on point. Federal cases considering the issue are divided. The Sixth Circuit has held squarely that apartment dwellers have a protected privacy interest in the common halls of a locked building, and that when police enter without authority or invitation, such as by a "tag-along" entry of the type apparently made in this case, evidence gained in the common areas as a result of the police entry must be suppressed. *United States v. Carriger*, 541 F.2d 545, 551–52 (6th Cir. 1976). Courts in other circuits have held to the contrary. *See, e.g., United States v. Moore*, 463 F.Supp. 1266 (S.D.N.Y. 1979); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977). These latter cases have emphasized that apartment building security doors protect security within apartments, not privacy within the common hallways.[6]

Upon review of the record before us, we have concluded that it is unnecessary to reach the constitutional issue raised by Hubert. Although there was some conflicting testimony on the point at the suppression hearing, when the entire record is read in the light most favorable to the state, as it must be here, there is substantial evidence to support the conclusion that Officers Grimes and Brandlen, after gaining access to Hubert's apartment building, went directly to the manager's apartment, where they knocked, identified themselves, and obtained information concerning Hubert and the location of his apartment.

Even if the officers' initial entry was trespassory in nature and Hubert could be found to have had a reasonable expectation of privacy in the common hallways of his building that would be subject to the protections of the Fourth Amendment of the United States Constitution and the parallel provisions of Article I, section 14 of the Alaska Constitution, we do not believe that there is any basis for his complaint under these facts.

**6.** Hubert places primary reliance upon *United States v. Fluker*, 543 F.2d 709, 715–17 (9th Cir. 1976). However, we believe that the express language of the court in *Fluker* limiting its holding to the specific circumstances presented renders that case inapposite. *Fluker* involved a forced entry by police through a locked outer door that opened into a small hallway in a basement that contained only two apartments. These facts were deemed significant in determining that the occupants of the apartments had a reasonable expectation of privacy in the common hallway of the basement.

■ Assuming that the officers trespassed in their tag-along entry to the building, Hubert cannot properly challenge the admissibility of the evidence obtained by them upon their immediate contact with the building manager. This court has recently held that, under the provisions of former Criminal Rule 26(g), which was applicable at the time in question, a person seeking to suppress evidence on the basis that it was the product of an unlawful search and seizure must have standing to assert the claim. *G. R. v. State,* 638 P.2d 191 (Alaska App., 1981). Although the officers' contact with the apartment manager arguably constituted a violation of her privacy in violation of the United States and Alaska Constitutions, no legitimate privacy interest of Hubert can be said to have been violated. We believe it clear that Hubert could have had no reasonable expectation that the manager would not divulge information concerning tenants residing in the building. Neither common sense nor evidence in the record would compel such a conclusion. Recent rulings of the United States Supreme Court in analogous cases furnish strong support to the conclusion that no privacy interest of Hubert could be said to have been violated by the police contact with his building manager, even if that contact was the result of a trespassory entrance into the apartment building. *Rawlings v. Kentucky,* 448 U.S. 98, 104–106, 100 S.Ct. 2556, 2561–2562, 65 L.Ed.2d 633, 641–42 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). As the court said in *Rakas*:

> As we stated in *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961 [966], 22 L.Ed.2d 176 (1969); 'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.' A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

439 U.S. at 133–34, 99 S.Ct. at 425, 58 L.Ed.2d at 394–95 (citations and footnote omitted).

While the presence of the officers in the common hallways of Hubert's apartment for the brief period after their tag-along entry into the building and before their contact with the manager could arguably be considered a violation of Hubert's own privacy interest, no information or evidence was gained by the officers at that time. As we have stated, the officers' actual contact with the manager and the information they derived therefrom cannot be deemed a violation of Hubert's personal rights, but, at most, amounted to an infringement of the rights of the manager. Accordingly, we conclude that Hubert has no standing to object to the officers' contact with his building manager and no right to seek suppression of the evidence derived from her.

■ A separate question exists as to the officers' observation of Dickenson entering apartment 215 C and as to their observation of an odor of marijuana when they passed by the apartment. There can be little doubt that Hubert has standing to assert the officers' conduct in this regard. However, we conclude that, at the time the officers passed by Hubert's apartment and made these observations, they could no longer be considered trespassers.

When viewed in the light most favorable to the state, the record provides clear and convincing evidence that the presence of Grimes and Brandlen in Hubert's apartment building was rendered consensual by virtue of the officers' contact with the apartment manager. The cooperation and assistance given to the officers by the manager after they made contact with and identified themselves to her compels the conclusion that, even if their entry into the building was initially trespassory, the presence of the officers in the building thereafter was with the manager's full knowledge and consent. The authority of the manager

to consent to the officers' presence in the building is not reasonably subject to question. *See, e.g., Phillips v. State,* 625 P.2d 816, 817–18 & n.5 (Alaska 1980).

Because a reading of the record favorable to the state establishes that Grimes and Brandlen saw Dickenson enter Hubert's apartment and smelled marijuana outside its entrance only after contacting the manager, any illegality arising from the officers' tag-along entry into the building was, by that time, vitiated by the manager's knowing acquiescence to and acceptance of their presence.

We turn next to Hubert's claim that his detention by Trooper Brandlen outside of his apartment building was an unlawful seizure. Hubert argues, first, that Brandlen's conduct in stopping Dickenson and him, and in requesting identification, cannot be justified as an investigative stop. Second, Hubert contends that, even if Brandlen's initial stop of the two men was valid, the subsequent detention of Hubert and Dickenson in Brandlen's car and the interrogation by Investigator Grimes amounted to an arrest without probable cause. We will discuss each of Hubert's arguments in turn.

Hubert's contention that Trooper Brandlen acted improperly in stopping Dickenson and him is premised in part on the argument that an investigative stop of the two men was impermissible because no serious harm to property or persons had recently been perpetrated.

█ The recent commission of a crime involving serious harm to persons or property was established under Alaska law as a prerequisite to a valid investigative stop by *Coleman v. State,* 553 P.2d 40 (Alaska 1976). Two more recent Alaska Supreme Court decisions shed additional light on the *Coleman* requirement and merit consideration. In *Ozenna v. State,* 619 P.2d 477 (Alaska 1980), police stopped the defendant and conducted a pat-down search in the course of investigating a burglary not in a dwelling in which one or two guns and some ammunition were taken. The court held that the crime being investigated was a serious

property crime within the meaning of *Coleman's* limitation on investigative stops and concluded that the police conduct was appropriate, since an articulable suspicion to stop the defendant and to conduct a pat down search existed. *Id.* at 479. In *Free v. State,* 614 P.2d 1374 (Alaska 1980), the court upheld an investigative stop occurring in the course of a police investigation of a burglary perpetrated two days previously; the court concluded that both the serious harm and recency standards of *Coleman* had been met.

█ The stop of Hubert was the result of an investigation initiated by a burglary committed on the previous evening, and thus the lapse in time between the burglary and the stop amounted to about a half a day. During that period of time, the police investigation progressed continuously, with the exception of an interlude of several hours after Lockman was booked into jail by Investigator Grimes. Under these circumstances, we find the recency criterion of the *Coleman* standard to have been fulfilled.

Because the three principals involved in the burglary were apprehended and confessed shortly after its commission, the argument is advanced that, at the time of Hubert's stop, the police investigation was no longer focused upon a burglary, a crime involving serious harm to property. It is contended that, instead, the investigation was merely one involving the crime of receiving and concealing stolen property, an offense substantially less serious than burglary. It is argued that receiving and concealing stolen property does not involve serious harm to property under the *Coleman* standard for investigative stops. We believe this argument to be shortsighted.

We need not decide whether investigations of receiving and concealing stolen property, in the abstract, would in all instances justify an investigative stop under *Coleman's* requirement of serious harm to person or property. It is sufficient to note that, in this case, the stolen property that was sought had been taken in a recently

perpetrated burglary. Despite the apprehension of the principals involved in the burglary, recovery of the goods stolen in the course of commission of that crime formed an integral part of the burglary investigation. We believe that the public in general and law enforcement officers in particular have a strong and vital interest in recovering property stolen in the course of a burglary within the period of time immediately following commission of the offense. It is manifest that, with passage of time, the fruits of a burglary will increasingly be likely to be transferred, separated and rendered inaccessible, substantially reducing the possibility of their recovery. Though it can accurately be said in this case that Hubert was suspected of receiving and concealing stolen property and that he was not suspected as a principal in the burglary which had recently occurred, reliance on this fact to conclude that the police effort was not part of the burglary investigation would be both arbitrary and irrational. Here, the close nexus between Hubert's possession of stolen goods and the burglary from which those goods were derived, coupled with the recency of the burglary and transfer of the goods to Hubert, support the realistic conclusion that the investigative stop of Hubert on the morning of February 21, 1978, was an integral part of the burglary investigation. Thus, under the holdings of *Ozenna* and *Free*, the element of recent, serious harm to property, as required by *Coleman*, was sufficiently satisfied when Brandlen stopped Hubert and Dickenson.

█ Hubert separately contends that police had no reasonable basis to stop him. He argues that the investigative stop and subsequent detention of Dickenson and Hubert were unwarranted due to the unreliability of Jim Lockman, who had furnished the bulk of the information focusing attention on Hubert. Hubert argues that Lockman's reliability was unknown and untest-

ed, and that Lockman's failure to identify the correct apartment building on the night of February 20, coupled with his vague description of the person known to him only as "Paul," made it unreasonable for investigating officers to act as they did in reliance upon his statements. Hubert's stress on the untested reliability of Lockman as an informant is, we believe, unwarranted here.

Lockman was a confessed principal, not an informant-for-pay. His statement implicating Hubert was against his own penal interest, which itself imports a significant element of reliability. *See State v. Alger*, 100 Idaho 675, 603 P.2d 1009 (1979).[7] Furthermore, despite Hubert's protestations to the contrary, we believe Lockman's information proved to be reasonably accurate and gave investigating officers substantial indications of his reliability prior to their stop of Hubert. Lockman's inability to pinpoint correctly the building in which he had traded the stolen furs for marijuana is neither determinative nor significant in assessing his reliability. Though Lockman identified the wrong building to investigator Grimes, its general appearance and construction were quite similar to the building in which Lockman had actually disposed of the stolen furs, which was next door. At the time of the identification, it was dark, and Lockman had been to the building he was trying to identify only once before, that same night, also in the dark. Lockman provided Grimes with an accurate description of the physical location of the building, its general construction, and specific details sufficient to permit its identification by Grimes and Brandlen. His description of the location of Hubert's apartment within that building was reasonably precise, and an ample and detailed description of the interior of the apartment was provided. With the exception of the details concerning the apartment's interior, all of the information given by Lockman was verified

---

**7.** *See also* Alaska R.Evid. 804(b)(3), which includes statements against penal interest as an exception to the hearsay rule. It should be noted that Lockman's statement to the police was against his penal interest not only in that it constituted a confession to his participation in the burglary, but also in that it implicated him in a separate drug offense. Lockman's statement could clearly not be viewed as a self-serving attempt on his part to shift the blame for his conduct to another person.

before Brandlen stopped Hubert. Given these circumstances, we believe that the indicia of Lockman's reliability were sufficient to be acted upon by a reasonably prudent person. In terms of either an articulable suspicion for an investigative stop or probable cause for arrest, no greater standard of reliability is required. *See, e.g., Cruse v. State*, 584 P.2d 1141, 1144 (Alaska 1978).

We therefore conclude that Trooper Brandlen's conduct in stopping Hubert and Dickenson and requesting them to produce identification constituted a permissible investigative stop.

We must next address the question whether the detention of Hubert after he had produced identification was lawful. On this point, Hubert argues that he was detained without probable cause and that the length of the detention, coupled with other circumstances, compel a finding that the detention was a full custodial arrest exceeding the permissible bounds of an investigative stop. In presenting this argument, Hubert relies chiefly on the decision of the United States Supreme Court in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).[8] We cannot agree with Hubert's contentions.

As we have held above, Trooper Brandlen's request for Hubert to produce identification was a reasonable and permissible investigative measure. Once Brandlen learned that the man who had exited the apartment building with a suitcase was Paul Hubert, the tenant of apartment 215 C, we believe that the available evidence was sufficient to give rise to probable cause for Hubert's arrest. In *Cruse v. State*, 584 P.2d 1141, 1144 (Alaska 1978), the Alaska Supreme Court, quoting *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879, 1890 *reh. denied*, 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949), stated:

Probable cause exists where 'the facts and circumstances within . . . [the offi-

cers'] knowledge, and of which they had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.

■ Here, the officers were aware of all of the information given by Lockman in his statement, as well as the information they gained from the manager of Hubert's apartment. The officers' knowledge further included their observations outside Hubert's apartment and Brandlen's observation of the general similarity in appearance between Hubert and the person named Paul, who had been described by Lockman. We believe that the totality of this information gave rise to probable cause for arrest upon Hubert's identification by Trooper Brandlen. This is especially so because Lockman had informed investigator Grimes that "Paul" intended to move out of his apartment that day, and Hubert left his apartment building carrying a large suitcase. Given the totality of the circumstances known to investigating officers, we believe that, upon Hubert's identification, a person of reasonable caution would have been warranted in the belief that Paul Hubert was the "Paul" who had exchanged a pound of marijuana for the furs stolen by Lockman in the burglary of the prior evening. Hubert's detention, and the subsequent contact between Hubert and Investigator Grimes which led to the consensual search of Hubert's apartment, were thus justified by the existence of probable cause for Hubert's arrest.

■ A reading of the record in the light most favorable to the state supports the finding that, in the course of Hubert's detention in Brandlen's car, no threats were made, there was no display of force, and Hubert was not handcuffed or otherwise placed under physical restraint. Upon the arrival of Investigator Grimes, Hubert was questioned only briefly. He had properly been given his *Miranda* rights. A reading

---

8. We note that Hubert's reliance upon *Dunaway* is subject to serious question in light of the recent United States Supreme Court ruling in *Michigan v. Summers*, —— U.S. ——, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).

of the record favorable to the state also makes it clear that he was accurately apprised by Grimes of the purpose and status of the police investigation, informed of Grimes' intent to seek a warrant to search Hubert's apartment, and given a realistic assessment of the possibility of a warrant being issued. The record further indicates that Hubert was not unduly pressured by Grimes into consenting to a search, but rather acted knowingly and intelligently in volunteering to permit the search. Similarly, the record contains convincing evidence that Hubert's subsequent reentry of his apartment with the officers and his execution of the consent to search form were voluntary acts on his part.

Thus, given probable cause for Hubert's arrest, we conclude that his consent to the search of his apartment was freely and voluntarily given and that there is no basis for suppression of the evidence yielded by this search, or of the statement later made by Hubert to Investigator Grimes.

Our conclusion that Hubert's detention was justified by probable cause for his arrest makes it unnecessary for us to address a number of additional issues raised on appeal.[9]

Accordingly, the judgment of the superior court is AFFIRMED.

**9.** Hubert has argued that his possession of a suitcase prior to being stopped would not justify his detention if it were otherwise unlawful. He has also argued that his intoxicated condition would preclude a finding that his consent to the search of his apartment removed the taint caused by his unlawful detention. Our conclusion that Hubert was not unlawfully detained makes these arguments irrelevant. Hubert has also contended that findings entered by the superior court failed to address either the unauthorized tag-along entry of officers into his apartment building or the question whether his detention in Trooper Brandlen's car for a period of 10 to 15 minutes constituted an arrest. Although neither practice may have called for the trial court to address these issues in ruling on Hubert's motions, since we have specifically resolved both of these issues on the basis of the evidentiary record, the trial court's failure to make specific findings with respect thereto is immaterial. Finally, Hubert has alleged that several specific findings made by the superior court in denying his motion to suppress are unsupported by the record. Our resolution of the primary issues raised by Hubert has, however, been based upon a consideration of the totality of the facts contained in the evidentiary record, viewed favorably to the state; these facts have been set forth in considerable detail in the text of our opinion. To the extent that specific findings of the superior court may have been inaccurate, they have not been relied upon by this court. In this regard, it is appropriate to note that, in affirming the decision of the superior court, we are not bound by the particular theories which were relied upon by that court in reaching its decision. *Moss v. State*, 620 P.2d 674, 677 (Alaska 1980); *Rutherford v. State*, 605 P.2d 16, 21 n.12 (Alaska 1979).