Linda Wilson, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Nancy R. Simel, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.[*]

**Rochette MOSS, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–3146.

Court of Appeals of Alaska.

Dec. 27, 1991.

## OPINION

COATS, Judge.

Rochette Moss was convicted, based upon his plea of no contest, of misconduct involving a controlled substance in the third degree, a class B felony. AS 11.71.-030. In entering his plea, Moss reserved his right to appeal Judge Rowland's denial of his motion to suppress his statements which Moss claimed the police obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We agree with Moss and reverse his conviction.

On November 9, 1988, Sergeant James Grimes of the Alaska State Troopers obtained a search warrant which authorized him to search a trailer home which was

[*] Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

Moss' residence. The police served the warrant the evening of November 9, 1988, at approximately 6:00 p.m. Approximately ten police officers, who were dressed in police marked raid gear, served the warrant. The police followed their usual procedure for executing warrants in drug cases, entering the residence with drawn weapons. The police found four people present in the trailer, including Moss and his wife. The police first searched a couch in the living room. The police then ordered Moss and the other occupants of the residence to sit on the couch. Sergeant Grimes explained at the suppression hearing that the police searched the couch to make sure there were no weapons or evidence in that area and then placed the occupants on the couch so that they could not obtain weapons or destroy or hide any evidence. Sergeant Grimes had a uniformed police officer stationed inside the residence at the front door. Sergeant Grimes explained that this officer's job was to watch the people who were sitting on the couch and make sure that they did not obtain any weapons or destroy any evidence. Sergeant Grimes stated that he believed that this officer would have stopped anyone trying to leave the residence and would have asked Sergeant Grimes if that person could leave the residence. Grimes stated that he would have given anyone permission to leave, but apparently never expressed this. Sergeant Grimes stated that he allowed the officer who was guarding the door to leave after approximately twenty to thirty minutes when the officer was no longer needed to secure the area.

After the police secured the residence and had the residents placed on the couch, Sergeant Grimes told them that they were not under arrest, that the police were going to search the residence "and then we will be out of your hair and gone." At this point Grimes and Moss went into the back bedroom and closed the door. Grimes explained that he was a sergeant with the

state troopers involved in narcotics enforcement. Grimes asked Moss questions about several people the police had intercepted at the airport who were involved in selling cocaine as part of a large organization. According to Grimes, police had information that these people were connected with Moss. Moss told Grimes that there was nothing for the police to find in the residence. Grimes explained that he had a court order, that he was going to search, and "then we will be on our way." Moss then explained that the police might find a plate which had some cocaine on it where a friend had consumed some cocaine. It is unclear whether the troopers had already located this cocaine before Moss made this statement, but the troopers apparently located a small amount of cocaine on a plate at this time. Grimes then asked Moss about a piece of paper which appeared to have notations of drug transactions on it. Moss originally tried to tell Grimes that the piece of paper was homework from a college course he was taking, but ultimately confessed to Grimes that the numbers represented drug transactions. According to Grimes, he questioned Moss for about fifteen to twenty minutes during this initial exchange. Grimes and Moss returned to the living room and Moss sat down again. A short time later, the police found more cocaine in a tool box. Following this discovery, Grimes again interviewed Moss in the back bedroom. Moss again made admissions admitting possession of this cocaine. Grimes then separately interviewed the other residents of the trailer.[1] Following these interviews, Moss asked to talk to Grimes again. Moss wanted to know what the other residents had told Grimes. Moss asked Grimes if he was going to be arrested that evening. Grimes assured Moss that he was not going to be arrested. The police ultimately left the residence without placing anyone under arrest. Grimes estimated that the police started the search at

---

1. Grimes testified that he interviewed Tina Moss in the back bedroom. Tina Moss refused to answer any questions. Following this short interview Grimes told Tina Moss that she was free to leave. Apparently Tina Moss then left the trailer and walked around outside the trailer. Grimes testified that as far as he knew, no one was with Tina Moss when she was walking around outside.

6:00 p.m. and left the residence at about 8:30 p.m.

■ The state first contends that the issue which Moss seeks to raise is not a dispositive issue. In *Oveson v. Anchorage*, 574 P.2d 801, 803 n. 4 (Alaska 1978), the supreme court held that the appellate courts of this state would not allow defendants to enter no contest pleas and reserve appellate issues unless the record clearly showed that the appellate court's resolution of the issue which the defendant reserved for appeal would be dispositive of the entire case and that the parties had so stipulated with trial court approval. However, in the trial court, the state agreed that this issue was dispositive of the case. At the change of plea hearing, the state represented that the police found two ounces of cocaine in Moss' home. The state represented that the police did not find any cocaine in Moss' bedroom and implied that except for the fact that the police found cocaine in Moss' home, there was little evidence which would otherwise show Moss' possession of the cocaine. The state specifically represented that it was necessary for the state to introduce Moss' admissions to prove its case. On appeal the state argues that it had sufficient evidence to prove its case without Moss' statements. The state therefore argues that the issue which Moss raises is not dispositive. The state points out that the police found cocaine on a plate which was in plain view in Moss' residence and in a plastic bag in Moss' tool box. In addition, the police found scales and a piece of paper with numbers on it which appeared to represent cocaine transactions in the trailer. However, given the number of people in Moss' residence at the time the police arrived, the state's case against Moss appears problematical without his statements. We accordingly conclude that we should hold the state to its original representation that the issue concerning Moss' statements is dispositive.

Moss contended in the trial court and contends on appeal that he was in custody during the time the police searched his residence. Moss contends that since he was in custody, the police needed to warn him of his *Miranda* rights before they could question him. It is undisputed that the police never warned Moss of his *Miranda* rights. The only question which this case presents is whether Moss was in police custody so that the police were required to warn Moss of his *Miranda* rights before questioning him.

In *Miranda*, 384 U.S. at 436, 86 S.Ct. at 1602, the Supreme Court required the police to advise a person of his fifth and sixth amendment rights before engaging in "custodial interrogation." The court stated:

By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Id.* (footnote omitted).

The Supreme Court of Alaska explained the concept of custodial interrogation in *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979). The court stated:

We agree that the objective, reasonable person perspective is the proper standard for determining custody. The custody determination must be made on a case-by-case basis, but the inquiry, as expressed by the court in *United States v. Hall*, 421 F.2d [540] at 545 [2nd Cir. 1969], is whether:

in the absence of actual arrest something ... [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates [to the defendant] that they would not have heeded a request to depart or to allow the suspect to do so.

This requires some actual indication of custody, such that a reasonable person would feel he was not free to leave and break off police questioning.

At least three groups of facts would be relevant to this determination. The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed

at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Id.* (footnotes omitted).

■ Superior Court Judge Mark C. Rowland, who conducted the evidentiary hearing and made the ruling in this case, applied the *Hunter* standard. He emphasized the fact that the police told Moss that he was not under arrest and concluded that Moss was not in custody at the time that he made the admissions to the police. Although we believe that this is a close case, we reach the opposite conclusion.

We believe that the amount of force which the police used to enter the residence and maintain control of the residence is a factor which supports a finding that a reasonable person in Moss' position would have felt that he was in police custody. We certainly do not fault the police for using necessary force to safely serve a search warrant and maintain control over a place while it is being searched. However, where the police use this type of force, even though it is necessary and justifiable, the force tends to establish custody. In *Lowry v. State*, we stated:

> Yet, especially when force is used or a display of weapons is made, a person who has been stopped and placed in the effective custody—albeit temporary—of the police may find little consolation in being advised that a formal arrest has not been made. The person so detained will certainly understand that he has been placed in custody, but he may not understand the temporary nature of the seizure unless it is explained. And if, as is likely, the person does not understand

the technical distinction between an investigative stop and a formal arrest, a mere statement that he has not been arrested may not suffice to inform him of the temporary nature of the detention; he may not realize that he will be free to leave as soon as the police have completed the brief, on-the-scene investigation that constitutes a stop.

707 P.2d 280, 283–84 (Alaska App.1985).

The fact that the police use force when they initially encounter a person, although an indication of custody, is not dispositive. In *Lowry* we upheld the decision of a trial court judge who concluded that Lowry was not in custody in spite of the fact that the police displayed weapons when they initially encountered him. *Id.* at 283. However, in that case we placed particular emphasis on the fact that, prior to the time when the police stopped Lowry, the police had contacted him by telephone and he had stated that he would willingly talk to the police. Lowry volunteered to drive from his home to meet with police investigators. *Id.* at 284. In addition, following the stop at gunpoint, the police put away their weapons after they found out Lowry was not armed, told him he was not under arrest, and asked him if he would be willing to accompany the police to the police station for questioning. Lowry was never handcuffed or otherwise physically restrained. *Id.* at 282.

A major factor which tends to establish that Moss was not in police custody during the search is the fact that Sergeant Grimes told Moss that he was not under arrest and told Moss that he was going to search Moss' residence and then leave. However, the *Miranda* decision does not merely cover situations when a person is in custody because he is arrested, it also applies to a situation when a person is deprived of "his freedom by the authorities in any significant way." 384 U.S. at 478, 86 S.Ct. at 1630. In *Berkemer v. McCarty*, 468 U.S. 420, 436, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984), the Supreme Court acknowledged that a traffic stop significantly curtailed a person's freedom. However, in deciding this issue, the Supreme Court em-

phasized the fact that a motorist who is subject to a traffic stop realizes that he will only be stopped for a short period of time, issued a citation, and allowed to leave.

In *United States v. Musgrave*, 726 F.Supp. 1027 (W.D.N.C.1989), the court held that the police were required to give *Miranda* warnings when they detained Musgrave while they were serving a search warrant. In *Musgrave*, the police told Musgrave that he was not under arrest. Musgrave testified that he understood that he was not going to be arrested during the search. *Id.* at 1031. Apparently the police did not display any weapons, although they were armed while they conducted the search. *Id.* at 1029–30. During the search the police questioned Musgrave for thirty to forty-five minutes. *Id.* at 1030. In deciding the case, the court pointed out that the fact that the police questioned Musgrave in his home tended to reduce the coercive impact of the questioning. *Id.* at 1032. However, the court concluded that the length of the questioning tended to show custody. In deciding that Musgrave was in custody, the *Musgrave* court distinguished that case from an ordinary traffic stop:

> The questioning in this case is also distinguishable from an ordinary traffic stop. A traffic stop occurs in public, and the exposure to public view reduces the ability of an unscrupulous policeman from using illegitimate means to elicit self-incriminating statements. The motorist is not likely to fear he will be subjected to abuse if he does not cooperate. Moreover, the motorist realizes that he will be given a citation and be permitted to proceed on his way after several minutes. *Berkemer*, 468 U.S. at 438–39, 104 S.Ct. at 3149–50.

The questioning of Defendant in this case did not occur in public. Instead, Defendant was placed in a closed room with three officers. Although he realized he would not be placed under arrest, it cannot be said that Defendant knew he would be free to leave after several min-

utes. In fact, Defendant's freedom of movement was significantly restrained for over an hour. *Id.* at 1033.

Although we concede that the issue is close, we conclude that Moss was in custody during the police questioning and that the police were required to give him *Miranda* warnings. In making this determination, we emphasize the fact that the police entered Moss' residence at gunpoint and controlled his movements and the other residents at least at the beginning of the search. The tape recording which the police took during the service of the search warrant shows that Sergeant Grimes questioned Moss extensively. Although Sergeant Grimes did tell Moss that he was not under arrest and that the police would search the residence and then leave, we still believe that the record shows that Moss was deprived of his freedom of action in a significant way. Moss was in custody much more than he would have been in an ordinary traffic stop. Once the police found the plate with cocaine, it does not seem reasonable to conclude that Moss knew that he was not under arrest and was free to go.[2] The search and questioning took a significant period of time—Sergeant Grimes estimated approximately two and one-half hours. Under these circumstances, we conclude that Moss was in police custody. The police were required to give Moss *Miranda* warnings or clarify that Moss was not in custody in order to question him. We accordingly reverse the decision of the superior court.

REVERSED and REMANDED.

BRYNER, C.J., dissents.

MANNHEIMER, J., not participating.

BRYNER, Chief Judge, dissenting.

Making no allowance for the trial court's broad discretion in factual matters and mistakenly construing the record in the light most favorable to Moss, the majority of the court substitutes its judgment for Judge Rowland's, concluding that Moss was in

---

**2.** Among other things, the record shows that Sergeant Grimes and Moss discussed the fact that Moss was on probation for a drug offense and was facing revocation of his probation.

custody when questioned, even though Moss was in his own home, all weapons initially displayed by the police had been put away, and Moss had been expressly told that he was not under arrest, that the sole purpose of the police presence was to perform a search of the premises pursuant to a warrant, and that the police would depart as soon as the search was completed.

Viewing the evidence in the light most favorable to the prevailing party below, *see Hubert v. State,* 638 P.2d 677, 683 (Alaska App.1981), I would conclude that Judge Rowland was not clearly erroneous in determining that Moss was questioned in a noncustodial setting. *Lowry v. State,* 707 P.2d 280, 284 (Alaska App.1985); *Hubert v. State,* 638 P.2d at 687–88.

Accordingly, I dissent.