Kathy S. HIGGINS, Appellant,

v.

STATE of Alaska, Appellee.

No. A-4722.

Court of Appeals of Alaska.

Dec. 23, 1994.

---

Linda K. Wilson, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Kenneth M. Rosenstein, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

Kathy S. Higgins pled no contest to two counts of misconduct involving a controlled substance in the third degree and one count of misconduct involving a controlled substance in the fourth degree, reserving the right to appeal [1] Superior Court Judge Milton M. Souter's denial of Higgins' motion to suppress evidence resulting from statements that Higgins claimed were obtained in violation of her Miranda[2] rights and were involuntary. Higgins now appeals. We reverse.

On October 31, 1990, the Alaska State Troopers obtained warrants to search Higgins' Anchorage residence and to arrest Michael Van Cleve, who lived with Higgins. Trooper Karma Van Gelder, accompanied by seven other troopers in raid gear and a uniformed Anchorage Police Officer, executed the warrant at 6:45 p.m. that same night. The officers approached and knocked on the front door; when no one answered immediately, one of them "kicked at the door to kick it open." At the same time, Higgins unlocked the door, which "flew open."

The officers rushed inside with their weapons drawn. Trooper Van Gelder encountered Higgins at the door; Higgins' two young children stood at her side. Michael Van Cleve ran down the hall, away from the door. As other officers chased Van Cleve down and placed him under arrest, Higgins "grabbed" at Van Gelder's hands. Van Gelder told Higgins that she was not under arrest; at the same time, Van Gelder ordered Higgins to "stand still and not to grab my hands." Higgins complied but became "progressively more hysterical." Van Gelder denied Higgins permission to pick up one of the children, but allowed her to put her arm around the child.

About five minutes after the officers arrived, Van Gelder directed Higgins to a bedroom and began to question Higgins without advising her of her Miranda rights. Van Gelder opened the questioning by saying:

[W]e know you've been selling cocaine out of this house and that's what we need to talk to you about. We've already ... arrested a lot of people in Seward today, okay? We've talked to a lot of people, you've got to make a decision right now. Okay, you're not under arrest at this moment, okay? You don't have to stay here.

Van Gelder further explained:

Okay. One thing you need to think about, okay? You're not under arrest right now. Okay? Uh, that doesn't mean that the charges aren't gonna be filed later. We have a lot of information, okay? You need to think very seriously, you got a couple of very cute little girls here.

A short time later, Van Gelder left the room to secure a shotgun that Higgins said was in a hall closet. As she left, Van Gelder

---

**1.** See Cooksey v. State, 524 P.2d 1251, 1256–57 (Alaska 1974). See also Oveson v. Anchorage, 574 P.2d 801, 803 n. 4 (Alaska 1978).

**2.** Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

asked Higgins to "stand here a minute." Upon Van Gelder's return, Higgins inquired about Van Cleve. Saying that Van Cleve had not yet been removed from the house, Van Gelder told Higgins, "I want you to stay right here, okay?" Van Gelder then directed Higgins' children into an adjacent bedroom and, after repeating, "Okay, like I said, you're not under arrest, okay? ... That does not mean that charges won't be filed later," proceeded to interrogate Higgins.

The interrogation lasted almost an hour. In the course of questioning, Higgins confessed having possessed and sold cocaine for Van Cleve and having possessed a small quantity for her own use. Higgins also told Van Gelder that Van Cleve had recently enlisted her to deposit some cocaine in a parked car for storage. Higgins agreed to accompany Van Gelder to the office of a magistrate, in order to secure a search warrant for the car. Higgins subsequently appeared before a magistrate and testified in support of the warrant. In the course of this testimony, Van Gelder asked Higgins if she had been told she was under arrest prior to questioning: "Did I tell you whether you were free to go or not?" Higgins replied, "Yes." Van Gelder further asked, "Okay, what did I tell you?" Higgins responded, "I could leave, that I wasn't under arrest."

Higgins was not arrested that night. Based primarily on her confessions to Van Gelder, however, she was later indicted. Prior to trial, Higgins moved to suppress all evidence resulting from her statements. She contended that Van Gelder had subjected her to custodial interrogation without first reciting the *Miranda* warnings; she also contended that her statements to Van Gelder were involuntary.

At the hearing on Higgins' suppression motion, Judge Souter listened to testimony from several witnesses, including Higgins and Van Gelder. The judge also listened to tape recordings of the troopers' October 31 entry into Higgins' home, of Van Gelder's interview with Higgins, and of Higgins' ensuing appearance before the magistrate.

Upon conclusion of the hearing, Judge Souter found that, under an objective standard, Higgins' interrogation had been custo-

dial—in other words, under the totality of the circumstances, a reasonable person in Higgins' position would have felt restrained and not free to go. Judge Souter based this finding on a number of factors: nine officers forced their way into Higgins' home without warning and with weapons drawn; Van Gelder first told Higgins that she was not under arrest "very quickly after" the forcible police entry; Van Gelder's precise statement was that Higgins was "not under arrest at this moment"; and Van Gelder told Higgins to stand still and not grab Van Gelder's hands. Based on these factors, Judge Souter concluded that, despite Van Gelder's statement that Higgins was not in custody, the initial contact between Van Gelder and Higgins was "a situation highly charged with custodial restriction."

What followed, in Judge Souter's view, did not alter the initial custodial atmosphere. Judge Souter found that "Van Gelder quite quickly [brought] the defendant's children into the situation." The judge pointed out that, on the one hand, Van Gelder repeated that Higgins was not under arrest, while, on the other hand, the trooper reminded Higgins, "That doesn't mean charges aren't going to be filed later," and, "You need to think very seriously. You got a couple of very cute little girls here." Based on his review of the tape recording of the interview, Judge Souter commented, "It's easy to say x and yet the way you say x you convey not x. The opposite. And that seems to be an instance of that occurring right there."

The judge characterized Van Gelder's words as "a statement charged with a threat of holding [Higgins] in custody." According to the judge, " 'Either cooperate or I'll take you into custody' is a reasonable interpretation of that statement. And, 'You better look out for your little kids if I take you into custody.' " Judge Souter further pointed out that, in the ensuing portions of the interview, there were several instances when Van Gelder told Higgins to "stay where she's at." The judge noted, finally, that, throughout the interview, Van Gelder's tone was "a controlling tone." Judge Souter emphasized that this conclusion was based on his review of the tape recording: "I had to listen to the

tape. It makes a difference. The trooper's tone was controlling." In fact, according to the judge, "This whole thing is charged with the tone of control, the tenor. Both the words that were used and the ... tone of voice, controlling."

Judge Souter summarized the totality of the circumstances as follows:

> That a reasonable person in [Higgins'] position, given the way this occurred, given the trooper's tone of voice, given the repeated indications that I recited into the record of control on the part of the trooper, that a reasonable person would have believed that they were not free to leave.

Nevertheless, Judge Souter went on to rule that the custodial atmosphere arising from the objective circumstances was not determinative, because, despite these circumstances, Higgins had subjectively believed that she was not in custody. The judge pointed to Higgins' testimony before the magistrate acknowledging that Van Gelder had told Higgins that she was not under arrest and was free to leave. Judge Souter interpreted Higgins' testimony as an admission that Higgins had believed what she was told: "She understood that she was free to leave. That's her testimony to the magistrate and I find it compelling."

Judge Souter concluded that, in this situation, Higgins' subjective belief governed, rather than the objective circumstances:

> [I]t appears to me that if a defendant truly believes that they're not in custody, that even though a reasonable person might have believed to the contrary, that it's the actual belief of the defendant that counts. And I do find that she indeed knew that she was free to leave.[3]

On this same basis—that Higgins was subjectively aware that she was not in custody—Judge Souter further concluded that Higgins' confession was voluntary.

On appeal, the state concedes that Judge Souter applied an incorrect legal standard in determining whether Higgins had been subjected to a custodial interrogation that required *Miranda* warnings. This concession appears to be well-founded.

In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (footnote omitted), the United States Supreme Court held:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

■ For purposes of determining the existence of *Miranda* custody, the United States Supreme Court has adopted an objective standard: "[T]he only relevant inquiry is how a reasonable [person] in the suspect's position would have understood [the] situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 & n. 35, 104 S.Ct. 3138, 3151 & n. 35, 82 L.Ed.2d 317 (1984). *See also Stansbury v. California*, ⸺ U.S. ⸺, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). The Alaska Supreme Court has adopted the same standard. *Hunter v. State*, 590 P.2d 888, 892, 895 (Alaska 1979). In keeping with *Hunter*, this court has consistently applied the objective test. *Edwards v. State*, 842 P.2d 1281, 1284 (Alaska App.1992); *Long v. State*, 837 P.2d 737, 740 (Alaska App.1992).

■ Under the objective standard, the existence of custody turns not on any single factor such as the intent or understanding of the accused, but rather on the totality of the

---

**3.** On reconsideration, Judge Souter qualified this ruling to a certain extent, explaining that the defendant's subjective belief that she was not in custody would prevail over the objective circumstances as they would have appeared to a reasonable person in the defendant's position, provided that an objective person viewing the situation from a detached and uninvolved standpoint—that is, from the position of a judge reviewing the situation in retrospect—would also conclude that the situation was not custodial. Judge Souter concluded, based on Van Gelder's repeated admonitions that Higgins was not under arrest and was free to leave, that a neutral and detached observer would not have believed that Higgins was in custody, even though a reasonable person in Higgins' position would have thought the situation custodial.

circumstances, objectively viewed.[4] *Carr v. State*, 840 P.2d 1000, 1003 (Alaska App.1992). As this court recently observed in *Long*, 837 P.2d at 742:

> [T]he issue of custody is not resolved by ... finding that Long had subjectively believed himself free to disregard [the officer's] wishes. Instead, the question is whether a reasonable person in Long's position would have felt free to choose whether or not to accompany [the officer].[5]

Resolution of Higgins' motion to suppress should thus have been governed by the objective test, under which the superior court expressly found that Higgins' interrogation was custodial. The trial court erred in resolving Higgins' motion on the basis of a subjective test of custody.

The state nevertheless argues that the superior court's finding of custody under an objective standard was clearly erroneous. In asserting clear error, however, the state presses its own interpretation of the factual record, largely disregarding the interpretation adopted by Judge Souter—an interpretation based on the judge's personal evaluation of the testimony at the evidentiary hearing and of Van Gelder's tape-recorded interview of Higgins.

In *Moss v. State*, 823 P.2d 671 (Alaska App.1991), we considered a roughly analogous situation. Several uniformed police officers, with guns drawn, forcefully entered Moss' residence and proceeded to execute a search warrant for drugs. The officers maintained control over the residence and its occupants as they performed the search. In this setting, Moss was questioned without *Miranda* warnings. The trial court found that no custodial interrogation had occurred.

This court reversed, concluding that the trial court was clearly erroneous in failing to find custodial interrogation. *Id.* at 675. We observed that, when the police forcefully enter a home to execute a warrant, "the force tends to establish custody." *Id.* at 674. We went on to emphasize that, after entering, the police maintained control of the premises and subjected Moss to extensive questioning. Although the police had told Moss that he was not under arrest, we concluded that "Moss was deprived of his freedom of action in a significant way." *Id.*

The state maintains that the evidence of custody is weaker here than it was in *Moss.* This argument falls short of the mark. In *Moss*, we thought the evidence of custody so strong that we declared the trial court clearly erroneous in declining to find

---

4. This is not to say that the accused's state of mind is to be wholly ignored. What is relevant is the totality of the evidence bearing on "the objectively manifested circumstances of the interview." *Long*, 837 P.2d at 740. Just as no single factor can be determinative, so no relevant factor should be ignored. To the extent that the accused's subjective beliefs may have inferential bearing on the issue of what a reasonable person in the accused's place might have believed, consideration of such evidence is permissible for this limited purpose. *See, e.g., Doyle v. State*, 633 P.2d 306, 310 (Alaska App.1981) ("It is also significant to note that [the interrogated subject] himself apparently felt that he could terminate the police contact[.]"). In the present case, despite his express finding that Higgins subjectively believed she was not in custody, Judge Souter determined that a reasonable person in Higgins' position would have concluded otherwise.

5. *See also State v. Sampson*, 808 P.2d 1100 (Utah App.1990):

> The state cites testimony to the effect that defendant did not consider himself under arrest even after he was formally arrested, suggesting this demonstrates that defendant could

not have believed he was in custody when he first confessed. This evidence is at most a commentary on defendant's acumen. Under the objective "reasonable person" test, defendant's subjective belief about custody is not relevant.

*Id.* at 1106 n. 11 (citing *Berkemer v. McCarty*, 468 U.S. at 442, 104 S.Ct. at 3151).

The trial court evidently reasoned that application of an objective standard of custody makes no sense if the accused is shown to have subjectively believed that custody was lacking. However, two rationales have commonly been advanced to support the use of the objective standard over the subjective: (1) the undesirability of rules requiring police officers to make decisions "in terms of what someone else is thinking," and (2) the inherent unreliability of after-the-fact efforts to determine the subjective states of mind of the participants in an interrogation. 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 6.6(c), at 491–92 (1984). These rationales would seem to militate against the use of a subjective standard of custody in all cases, regardless of whether a particular suspect appears to have believed in the existence or nonexistence of custody.

*Miranda* custody. By contrast, in the present case, we must uphold the trial court's finding of custody unless we find the evidence so weak that the finding of custody would necessarily amount to clear error. While the evidence in the present case certainly appears to be somewhat weaker on the issue of custody than it was in *Moss,* our review of the record convinces us that reasonable judges could differ on whether custodial interrogation was objectively shown.[6] Although another judge might reasonably have construed the evidence to establish that Higgins was not in custody, we are unprepared to say that Judge Souter was clearly erroneous in finding, under the objective test, that Higgins was in *Miranda* custody during her interrogation. Accordingly, we conclude that the trial court's order denying Higgins' motion to suppress must be reversed.[7]

REVERSED.

---

6. By way of comparison, in *Peterson v. State,* 813 P.2d 685 (Alaska App.1991), Peterson was caught selling drugs to an undercover officer. An interview occurred in Peterson's home after he was advised that he was not under arrest and would not be arrested. The police entry was by invitation and no force was used. Peterson was questioned in a friendly manner during a forty-five minute period. His family was at home at the time, and Peterson freely interrupted the interview to converse with family members. We concluded in *Peterson* that the trial court was not clearly erroneous in finding that Peterson was not in *Miranda* custody when questioned. *Id.* at 691. The facts in *Peterson* were plainly more favorable to the state than those in either the present case or *Moss.* On balance, the present case appears to fall somewhere between *Moss* and *Peterson.*

7. Our disposition of this issue makes it unnecessary to consider whether Higgins' confession was voluntary.