**William R. BAXTER, Vincent T. Haugen, and Lara C. Johnson, Appellants,**

**v.**

**STATE of Alaska, Appellee.**

**Nos. A–7982, A–7996, A–7998.**

Court of Appeals of Alaska.

Sept. 12, 2003.

---

J. John Franich, Jr., Assistant Public Advocate, Fairbanks, and Brant McGee, Public Advocate, Anchorage, for Appellant Baxter.

Marcia E. Holland, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant Haugen.

Robert S. Noreen, Fairbanks, for Appellant Johnson.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Based on evidence obtained during a traffic stop and the ensuing arrest of the driver for not having a valid driver's license, the police obtained a search warrant for a Fairbanks residence. There, they uncovered a methamphetamine lab run by the three defendants in this case. On appeal, the defendants claim that this evidence was obtained illegally and should be suppressed. For the reasons explained here, we conclude that the evidence against the defendants was obtained lawfully, and we accordingly affirm the defendants' convictions.

*Underlying facts*

On the evening of May 1, 1999, North Pole Police Officer Gary Jurgens stopped a car for having a burned-out headlight. The driver, Lara C. Johnson, told the officer that she did not have a valid driver's license. Jurgens went back to his patrol car and, using the computer, confirmed what Johnson had told him.

Jurgens returned to Johnson's car. He asked Johnson if she was carrying drugs on her person or in her vehicle. When Johnson said "no", Jurgens asked her if he could search her and her vehicle. Johnson replied that she did not care.

Jurgens then asked Johnson to empty her pockets onto the trunk of her car. Johnson removed some money and placed it on the trunk. But after Johnson had finished rummaging through her pockets, Jurgens noticed that there was a bulge in her front pocket. He asked her to "go ahead and . . . take the other items out." Johnson then removed three folded-up coffee filters from her pants pocket and two pill bottles from her jacket pocket.

When Jurgens asked Johnson if he could open up the coffee filters, she again said that she did not care. Jurgens unfolded one of the filters and discovered a white powdery substance inside. Based on his training and experience, he believed that this substance was methamphetamine.

Johnson also gave Jurgens permission to open the pill bottles. One bottle contained some blue pills that Johnson said were over-the-counter sleeping pills. The other bottle contained "black and tarred-up silverish . . . little balls" of a type Jurgens had never seen. Jurgens could not identify these little balls, but he suspected that the black substance might be tar heroin.

After conducting these searches, Jurgens arrested Johnson—but not for possession of drugs. Rather, he arrested her for driving without a valid driver's license. (Jurgens did not arrest Johnson for possession of methamphetamine because, under his police department's procedures, no arrests were made for drug possession until the State Crime Laboratory positively identified the suspicious substance.) After arresting Johnson for the driving offense, Jurgens transported her to the North Pole police station.

At the police station, Jurgens conducted a more thorough search of Johnson's person. During that search, he opened Johnson's wallet and found a folded piece of paper inside it. Jurgens removed this paper and unfolded it; he found that it contained a written list of items—items that he believed were used for making methamphetamine. Jurgens photocopied the list so that he could do some follow-up investigation, and then he returned the piece of paper to Johnson's wallet.

Three days later, Jurgens contacted Investigator Tim D. Birt of the Statewide Drug Enforcement Agency regarding his May 1st encounter with Johnson. Jurgens gave Birt a copy of his police report, the items he had seized from Johnson, and the photocopy of the list he had found in Johnson's wallet. Birt confirmed that the powdery substance was methamphetamine, and he determined that the black and silverish balls were iodine crystals. When Birt examined the photocopied list, he immediately recognized that it was "a complete list of items necessary for manufacturing methamphetamine, as well as some of the [necessary] equipment."

Two months later, Investigator Birt applied for a search warrant to search Johnson's residence for a methamphetamine lab. The search warrant application was based, in large part, on the evidence seized during Jurgen's May 1st encounter with Johnson.

When the police executed the search warrant, they discovered a clandestine methamphetamine lab. Johnson, her live-in boyfriend, Vincent T. Haugen, and a guest,

William R. Baxter, were all present at the residence during the search. All three were subsequently indicted for third-degree controlled substance misconduct (manufacturing methamphetamine).[1] They were also charged with fourth-degree misconduct under two theories: maintaining a dwelling for the keeping or distribution of a controlled substance, and possession of methamphetamine.[2] These charges were eventually consolidated into a single count of conspiracy to manufacture methamphetamine.[3]

(In addition, Baxter was arrested at the scene on an outstanding warrant for failing to register as a sex offender. During a pat-down search incident to this arrest, the police discovered a brown vinyl pouch on Baxter's person. Birt obtained a search warrant to open the pouch; it contained a small amount of methamphetamine and drug paraphernalia. Baxter was therefore charged with an additional count of fourth-degree controlled substance misconduct.)

*The searches that were conducted with Lara Johnson's consent during the traffic stop*

 On appeal, the defendants contend that the searches conducted by Officer Jurgens during the traffic stop—searches ostensibly performed with Lara Johnson's consent—were nevertheless illegal because Johnson did not knowingly and voluntarily consent to these searches. (The State does not challenge Haugen's and Baxter's standing to assert the violation of Johnson's Fourth Amendment rights.)

The defendants point out that Johnson was never free to leave during the traffic stop, because what would have been a minor offense (a burned-out headlight) quickly became the more serious offense of driving without a valid license. They argue that, at this point, Johnson would have suspected that she was going to be arrested, or at least she would have been uncertain as to whether Jurgens intended to arrest her (as opposed

1. AS 11.71.030(a)(1).

2. AS 11.71.040(a)(5) and AS 11.71.040(a)(3)(A), respectively.

3. AS 11.71.020(a).

to issuing her a citation). The defendants further argue that Jurgens either consciously or at least implicitly took advantage of Johnson's uncertainty—and Johnson's attendant psychological pressure to remain on the officer's good side—when Jurgens asked Johnson to agree to the searches of her person and of the vehicle. The defendants note that Jurgens never told Johnson that she had the right to refuse the officer's requests.

 As we explained in *Schaffer v. State*[4], "When the government relies on the 'consent' exception to the warrant requirement, two main issues must be litigated: did the defendant indeed consent, and did the defendant do so with the requisite voluntariness?" As we further explained in *Schaffer*, even when a defendant expressly consents to the requested search, the government must still establish that the consent was "voluntary, unequivocal, intelligently given, and not the product of duress or coercion".[5] Ultimately, whether a defendant voluntarily consented to a search is a question that must be assessed based on the totality of the circumstances.[6]

We acknowledge that the circumstances of a traffic stop can be coercive. But all of the circumstances noted by the defendants were brought to the superior court's attention when the defendants litigated their suppression motions. After hearing this evidence (and the defendants' arguments concerning it), Superior Court Judge Ralph R. Beistline concluded that Johnson had voluntarily consented to the searches at the scene of the traffic stop.

 When we review a trial court's ruling on a motion to suppress evidence, we view the record in the light most favorable to the trial court's ruling.[7] For the most part, the trial court's findings of fact will be reversed only if (viewing the evidence in this light) the findings are clearly erroneous.[8] But when we review the trial court's conclusions regarding the accused's state of mind and the issue of voluntariness, we "examine the entire record and make an independent determination".[9]

Based on the record in this case, we uphold Judge Beistline's ruling that Johnson validly consented to reveal the contents of her pockets to Jurgens.

In a footnote in Haugen's brief, he urges us to consider the recent decision of the New Jersey Supreme Court in *State v. Carty*, 170 N.J. 632, 790 A.2d 903 (2002). Haugen asserts that the *Carty* decision represents a judicial acknowledgement that there is good reason to question the voluntariness of any consent to search given by a motorist during a traffic stop.

In *Carty*, the New Jersey Supreme Court does indeed question whether motorists feel completely free to refuse a police officer's request to search during a traffic stop.[10] But the New Jersey court did *not* rule that a motorist's consent to search under such circumstances fails to qualify as "knowing and voluntary". Rather, the New Jersey court adopted a prophylactic rule to limit the circumstances in which a police officer may *ask* a motorist to consent to a search. The court ruled that a police officer may not ask motorists for their consent to a search unless the officer already has reasonable suspicion that the motorist is engaged in illegal activity and that the search will yield evidence of that illegal activity.[11]

Obviously, the fact that a police officer has reasonable suspicion of criminal activity has

---

4. 988 P.2d 610, 613 (Alaska App.1999).

5. *Id.* at 615.

6. *Frink v. State*, 597 P.2d 154, 169 n. 30 (Alaska 1979) (the voluntariness of a person's consent to a search is a question of fact, to be determined from the totality of the circumstances).

7. *Stumbaugh v. State*, 599 P.2d 166, 172 (Alaska 1979); *Hubert v. State*, 638 P.2d 677, 683 (Alaska App.1981).

8. *Chilton v. State*, 611 P.2d 53, 55 (Alaska 1980); *Tagala v. State*, 812 P.2d 604, 607 (Alaska App. 1991).

9. *Beagel v. State*, 813 P.2d 699, 704 (Alaska App. 1991).

10. *Carty*, 790 A.2d at 910–11. *See also* Justice Stevens's dissent in *Ohio v. Robinette*, 519 U.S. 33, 47–48, 117 S.Ct. 417, 425, 136 L.Ed.2d 347 (1996).

11. *Carty*, 790 A.2d at 912.

nothing to do with whether the motorist's consent to the requested search is knowing and voluntary. In particular, the existence of reasonable suspicion to support the officer's request for a search does nothing to lessen the inherently coercive aspects of the situation for the motorist. What the *Carty* decision implicitly acknowledges is that (1) the motorist's consent to the search will normally be "voluntary and knowing" when analyzed under traditional Fourth Amendment law, and therefore (2) if there is to be a restriction on police officers' ability to ask motorists to consent to a search, that restriction must rest on a different legal rationale.

The rationale adopted in *Carty* and in various decisions from other jurisdictions [12] is

that (1) traffic stops are lawful only to the extent that they are confined in scope and duration to the officer's legitimate Fourth Amendment purpose—the purpose of citing the motorist for a violation of the traffic laws, and therefore (2) an officer is entitled to enlarge the scope or duration of the stop (by, for example, seeking permission to engage in an unrelated search) only if the officer has reasonable suspicion to support an investigative stop for a different purpose.

The defendants in this case do not raise this "scope and duration" constitutional issue, and we express no opinion on the proper resolution of this question. Our point is that the New Jersey Supreme Court's decision in

**12.** *Federal cases: See United States v. Chavez–Valenzuela*, 268 F.3d 719 (9th Cir.2001) (finding that the continued detention of a motorist after the resolution of a traffic offense was not justified because the officer did not have a reasonable and articulable suspicion of other criminal activity); *United States v. Purcell*, 236 F.3d 1274, 1280 (11th Cir.2001) ("unrelated questions which unreasonably prolong the detention are unlawful"); *United States v. Holt*, 229 F.3d 931, 940 (10th Cir.2000) (holding that an officer exceeded the reasonable scope of detention for a traffic stop when the officer asked the motorist about issues unrelated to the purpose of the stop—the motorist's failure to wear a seatbelt); *United States v. Holloman*, 113 F.3d 192, 196 (11th Cir.1997) (noting that a traffic stop must not last longer than necessary to investigate and process the traffic violation). *Compare United States v. Allegree*, 175 F.3d 648, 650–51 (8th Cir.1999) (focusing on the issue of whether the officer's questioning unreasonably extended the duration of the stop); *United States v. Jones*, 44 F.3d 860 (10th Cir.1995) (finding that continued detention of a motorist was justified because the officer had a reasonable suspicion that the motorist was transporting illegal drugs); *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir.1993) (rejecting the argument that a traffic stop was unreasonably extended when the officer asked unrelated questions while waiting for the results of a computer check).

*State cases: People v. Cox*, 202 Ill.2d 462, 270 Ill.Dec. 81, 782 N.E.2d 275, 278–79 (2002) (holding that a police officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the stop in the first place); *People v. White*, 331 Ill.App.3d 22, 264 Ill.Dec. 367, 770 N.E.2d 261, 267 (2002) (holding that a police officer's questioning during a traffic stop is limited in both duration and scope by the purpose of the stop); *State v. Mitchell*, 265 Kan. 238, 960 P.2d 200, 203 (1998) (holding that the duration of a traffic stop was unreasonable when, after the officer obtained enough informa-

tion to issue the citation, the officer began to question the motorist about drug-related offenses); *State v. Taylor*, 126 N.M. 569, 973 P.2d 246, 253–54 (N.M.App.1998) (police are not entitled to go on a fishing expedition while conducting their investigation of the offense that initially justified a traffic stop); *State v. Domínguez–Martínez*, 321 Or. 206, 895 P.2d 306, 309 (Or.1995) (holding that, under Oregon statutory law, a police officer who has stopped a vehicle to investigate a traffic infraction "may investigate only that infraction, unless the state can point to some [other] basis ... to broaden the scope of the investigation"). *Compare State v. Swords*, 258 Ga.App. 895, 575 S.E.2d 751, 752–53 (2002) (holding that an officer who stopped a motorist on the mistaken belief that his truck was missing a temporary tag was not permitted to continue his investigation after determining that the tag was in fact present); *Green v. State*, 93 S.W.3d 541, 547 (Tex.App.2002) (holding that an officer could ask questions unrelated to the purpose of the traffic stop while he ran a computer check because this questioning did not extend the length of the motorist's detention); *Maysonet v. State*, 91 S.W.3d 365, 373 (Tex.App.2002) (holding that, during a traffic stop, an officer is permitted to ask the driver for their license, proof of registration, and insurance, and may also inquire as to the motorist's destination and the purpose of the trip); *Henderson v. State*, 250 Ga.App. 278, 551 S.E.2d 400, 402 (2001) (explaining that an officer may ask unrelated questions while writing out a citation or warning, but cannot extend the duration of stop by unrelated questioning either by delaying the writing-out of the citation or warning, or by questioning the motorist following the issuance of the citation or warning).

*See also* Wayne R. Lafave, *Search & Seizure* (2002 Supp.), § 9.2, Vol. 4, p. 17–22 (discussing the issue of whether, during a traffic stop or an investigative stop, police officers may pursue questioning or seek consent to a search "which is unrelated to the basis upon which the stop was lawfully made").

*Carty* does not support Haugen's argument that traffic stops are inherently so coercive as to preclude (or presumptively preclude) a finding that the motorist voluntarily consented to a search. If anything, *Carty* supports the opposite conclusion—which is why the New Jersey Supreme Court believed that they had to adopt a different approach to the problem.

In a related argument, the defendants argue that even if Johnson initially consented to the search of her person (by removing the money from her pockets), she later implicitly withdrew this consent when she stopped taking things out of her pockets and "hesitated" before acceding to Jurgens's request to continue (thereby revealing the coffee filters and pill bottles).

But Judge Beistline appears to have taken Johnson's conduct into account when he found that the entire search was voluntary. Even though the defendants made a similar argument at the suppression hearing, Judge Beistline declared that Johnson "did not at any time indicate a desire to retract her consent." The judge noted that Johnson never objected to emptying her pockets and that later, when Jurgens asked whether he could open the coffee filters and pill bottles that Johnson had pulled from her pockets, Johnson again responded, "I don't care." Judge Beistline further noted that Johnson cooperated with Jurgens throughout the entire search.

 Of course, an individual may withdraw or limit their consent to a search at any time before the search is completed, by either a verbal or physical act indicating that the consent has been withdrawn.[13] Once voluntary consent has been given, however, the person's "lack of objection to subsequent closely related entries and searches" implies that the defendant's consent was not withdrawn. *Phillips v. State*, 625 P.2d 816, 818 (Alaska 1980). See, for instance, *United States v. Brown*, 884 F.2d 1309, 1312 (9th Cir.1989), where the court ruled that "any reluctance [the defendant] showed in admitting [that] he was carrying the keys to his

luggage was not enough to indicate that he had withdrawn his [prior] unambiguous statement of consent".

Here, Judge Beistline did not clearly err when he concluded that Johnson did not withdraw her consent to the search.

*The post-arrest search of Lara Johnson's wallet*

██ ██ As explained above, after Jurgens arrested Johnson for driving without a valid license, he brought her to the police station and performed a more thorough search of her person. During this search, Jurgens opened Johnson's wallet. Inside the wallet, Jurgens observed a folded piece of paper. He removed this paper, unfolded it, and found that it contained a list of items needed to manufacture methamphetamine.

The State argues that this search was justified because (1) Johnson was under arrest, (2) Jurgens had probable cause to believe that Johnson possessed drugs, and therefore (3) Jurgens could search Johnson's wallet for concealable evidence of drug possession. The problem with the State's argument is that, although Johnson was under arrest, she was not under arrest for possession of drugs.

 Under Alaska law (as opposed to federal law), a search incident to arrest is limited to weapons and concealable evidence of the crime for which the arrest was made.[14] The State does not argue that Johnson's wallet might have held concealable evidence of the crime of driving without a valid license. Rather, the State argues that the search of Johnson's wallet was justified because the wallet might have contained evidence of illegal possession of controlled substances.

In *Layland v. State*, 535 P.2d 1043, 1047 (Alaska 1975), our supreme court held that a search incident to arrest requires a substantially contemporaneous arrest; the police can not perform a "search incident to arrest" merely because they have probable cause to

---

**13.** *See LaFave*, § 8.1(c), Vol. 3, pp. 631–32.

**14.** *State v. Joubert*, 20 P.3d 1115, 1118, 1119 (Alaska 2001); *McCoy v. State*, 491 P.2d 127, 138 (Alaska 1971).

arrest the suspect and *could* arrest the suspect if they chose to.

But the present case involves a somewhat different issue. It is true that Jurgens consciously decided not to arrest Johnson for illegal possession of drugs. However, Johnson was under arrest at the time of this search—under arrest for driving without a valid license. The question is whether, during a search incident to arrest, Alaska law restricts the police to searching for evidence of the particular crime for which the suspect has been arrested or, instead, Alaska law allows the police to search the arrestee for evidence of any crime for which the police have probable cause—here, illegal possession of drugs.

We conclude that this question is answered by our decisions in *Snider v. State*, 958 P.2d 1114 (Alaska App.1998), and *State v. Kendall*, 794 P.2d 114 (Alaska App.1990). In *Snider* and *Kendall*, we held that the propriety of a search incident to arrest is to be assessed, not based on the police officer's subjective belief or understanding concerning the rationale for the arrest, but rather based on whether the facts known to the officer provided an objective justification for the arrest.[15] In particular, we concluded in *Snider* that a contrary rule—*i.e.*, a rule limiting these searches to evidence of the particular crime envisioned by the arresting officer—would lead to unfortunate and unjustified results:

> [A]pplication of [a] rule requiring officers to state the correct ground before an arrest is valid would lead to a procedure where officers would be trained to state every possible ground for making an arrest, so that the arrest would be upheld if any one of the grounds was valid. Furthermore, requiring the officer to state the correct ground for arrest would result in the exclusion of evidence in cases where the person who was arrested had not had his rights violated.
>
> In the instant case, the police had reasonable suspicion to stop [the defendant], ... and ultimately had sufficient information to arrest him for possession of [illicit drugs]. [The defendant] personally had no

interest in whether the police who arrested him were able to correctly articulate the basis for the arrest. The only possible goal which we would accomplish by suppressing the evidence against [the defendant] would be to require police in future cases to more carefully articulate their grounds for arrest. We are unconvinced that such a ruling would have any positive effect.

*Snider*, 958 P.2d at 1117–18.

The present case is arguably distinguishable from *Kendall* and *Snider* because, here, the police officer actually made a conscious decision *not to arrest* Johnson for the drug offense, despite having probable cause to believe that she had committed this offense. But the same reasoning applies to these facts as well.

If we adopted a rule that limited searches incident to arrest to evidence of the precise crime for which the arrest was made, we would simply motivate the police to charge arrestees with any and all conceivable crimes. At the same time, we would defeat the salutary policy that was followed by the police department in the present case: the policy of not charging people with felony drug offenses (with all of the attendant expense and disruption of the suspects' lives) unless and until the officer's suspicions are confirmed by laboratory analysis.

We therefore conclude that because Officer Jurgens had validly arrested Johnson for driving without a valid license, and because Jurgens had probable cause to believe that Johnson was guilty of possession of illicit drugs, he could search Johnson's person— and, in particular, her wallet—for evidence of possession of illicit drugs as part of the search incident to arrest.

In addition, we also conclude that the officer's search of Johnson's wallet was authorized because it was done with Johnson's consent. When Jurgens searched Johnson's wallet, Johnson had already given the officer consent to search her person for illegal drugs. (And we have upheld the voluntariness of that consent.) Prior Alaska cases

---

**15.** *Snider*, 958 P.2d at 1117–18; *Kendall*, 794 P.2d at 117.

have held that, when the police lawfully search a suspect's person, the police may search articles of personal property "immediately associated with the person" [16]—such as a wallet.

We acknowledge that Alaska's prior cases on the question of "associated articles" all deal with searches incident to arrest, not with consent searches. There is a difference. In a search incident to arrest, the scope and intensity of the search are prescribed by various rules of law; but in a consent search, the permissible limits of the search are established by the scope of the consent that has been given. One might argue that, even though Johnson consented to a search of her person, she did not mean to include personal items such as her wallet. On the other hand, Johnson had already voluntarily emptied her pockets (both her pants pockets and her jacket pockets), and there is no indication that she objected to the officer's search of her wallet.

We conclude that we need not resolve this potential dispute (nor ask the superior court to resolve it). In their briefs to this Court, the defendants do not argue that even if Johnson consented to the search of her person for drugs, this consent did not include her wallet. Nor do the defendants raise any other legal argument to dispute Jurgens's authority to search Johnson's wallet for drugs. Rather, the defendants argue that even though Jurgens was entitled to search the wallet for drugs, the officer exceeded the permissible scope of that search when he unfolded the piece of paper and read it. [17]

For these reasons, we uphold the officer's search of Johnson's wallet for drugs. The remaining issue is whether, in the course of searching the wallet for drugs, the officer was authorized to remove, unfold, and read the folded piece of paper.

*The unfolding and reading of the piece of paper*

■ Finally, the defendants argue that even if Jurgens was entitled to search Johnson's wallet, he had no authority to open and read the folded piece of paper that he found inside the wallet. The defendants point out that this paper was not folded in a manner suggesting that it was a "slip" or "bindle" (*i.e.*, a characteristic single-purpose container for drugs). The defendants argue that the incriminating nature of the paper was revealed only after Jurgens unfolded it and read it—and thus Jurgens was not entitled to do that.

The State responds by arguing cursorily that, because Jurgens was entitled to search Johnson's wallet for evidence of drugs, he was entitled to remove and open the folded piece of paper. The issue is not that simple.

Jurgens was entitled to search Johnson's wallet for *drugs* because she had consented to this search. Jurgens was also entitled to perform an arguably more intensive search— a search of Johnson's wallet for *evidence of drug possession*—as part of the search incident to Johnson's arrest (because the wallet was an article of personal property "immediately associated" with her person).

We acknowledge that Jurgen's opening and inspection of the folded piece of paper within Johnson's wallet represents a different level of intrusion than merely opening her wallet and inspecting its contents. But in *McCoy v. State*, 491 P.2d 127 (Alaska 1971), the supreme court held that an officer performing a search incident to arrest can seize and open closed containers found on the

---

16. *Hinkel v. Anchorage*, 618 P.2d 1069, 1071 (Alaska 1980).

17. In Johnson's opening brief (pp. 9–10), she argues: "Officer Jurgens specified in his testimony that Ms. Johnson gave him permission to search her for narcotics. [But n]othing in that consent gave Officer Jurgens the right to search Ms. Johnson for anything other than narcotics. Neither did Ms. Johnson give Officer Jurgens specific permission to read her personal papers."

Likewise, in Appellant Haugen's opening brief (pp. 21–22), he notes that "[t]he [State's] justification for searching the wallet was for evidence of drug possession", and he argues that the officer could not have reasonably believed that the folded piece of paper contained drugs or was otherwise evidence of drug possession. Haugen reiterates this position in his reply brief (p. 7): "The question raised by Mr. Haugen ha[s] to do with the scope and intensity of the search for weapons or contraband, not that the search itself could take place."

person of the arrestee.[18] Thus, Jurgens was presumptively entitled to open and inspect the contents of any closed containers that he found on Johnson's person or in her wallet. This means that even if the folded piece of paper is analogized to a closed container, Jurgens was presumptively entitled to open and read it.

However, in Alaska, the scope or intensity of a search incident to arrest is limited by the offense being investigated.[19] The police may search only those items that might constitute or contain fruits, instrumentalities, or other evidence of that crime.[20] Thus, Jurgens's authority to open and read the folded piece of paper depends on whether there was reason to believe that this item either contained illicit drugs or was some other evidence of Johnson's crime of drug possession.

The Alaska Supreme Court addressed this same situation (police inspection of a folded piece of paper found in a suspect's wallet) in *Middleton v. State*, 577 P.2d 1050 (Alaska 1978). The police had arrested Middleton for armed robbery. During a search incident to arrest, the police examined Middleton's wallet and found that it contained a folded piece of paper. The police opened the piece of paper and discovered that it was a floor plan of the liquor store where the robbery was committed.[21]

On appeal, the defendant argued that even if the police were authorized to search her wallet as a search incident to arrest, they could not lawfully open the folded piece of paper without a warrant.[22] The supreme court rejected this argument, declaring that "the officers were not required to obtain a warrant to authorize them to open the folded piece of paper" because "the opening of the paper was an integral part of the search for evidence permitted [by] *McCoy* [*v. State*, 491 P.2d 127, 130–31 (Alaska 1971) ]".[23] In other words, the supreme court concluded that there was reason to believe that the folded piece of paper either constituted or contained evidence of Middleton's crime. The court noted that "evidence of an armed robbery clearly can ... take[ ] the form of cash (including marked money) or indications of premeditation (for example, floor plan sketches)." [24]

In this context, "reason to believe" does not mean "probable cause". Rather, it is a lesser standard. For example, in *Lemon v. State*[25], the supreme court upheld the seizure and search of a burglary suspect's clothing (incident to his arrest)—thus allowing the government to use specks of insulation from the burgled building that were found clinging to Lemon's clothes. The court concluded that, even one and a half days after the burglary, "there was a 'likelihood' that the clothing Lemon was wearing at his arrest ... would contain evidence of the crime for which he was arrested".[26]

Clearly, the supreme court was not using the word "likelihood" in the sense of "more probable than not". Rather, the search was valid because there was reason to suspect that (a) some or all of the clothing that Lemon wore at the time of his arrest was the same clothing he had worn during the burglary the day before, and (b) this clothing might contain trace evidence connecting Lemon to the crime. Similarly, in *Middleton*, the supreme court did not uphold the search because the outward appearance of the folded piece of paper in Middleton's wallet gave some particular indication that this paper was evidence of the bank robbery. Rather, the court concluded that the search of the paper was lawful because (a) bank robbery is a crime that is generally premeditated, and thus (b) it is reasonable to suppose that bank robbers might write notes on pa-

18. *McCoy*, 491 P.2d at 135–38.

19. *See Lemon v. State*, 514 P.2d 1151, 1158 (Alaska 1973).

20. *McCoy*, 491 P.2d at 137.

21. *Middleton*, 577 P.2d at 1051.

22. *Id*. at 1055.

23. *Id*.

24. *Id*.

25. 514 P.2d 1151 (Alaska 1973).

26. *Id*. at 1159.

per relating to their planning or execution of the offense.

Thus, the issue in the present case is whether there was any reason to believe that the folded piece of paper in Johnson's wallet constituted or contained evidence of her crime of methamphetamine possession.

The answer would be easy if the officer had had probable cause to believe that Johnson was *distributing* drugs. It is eminently reasonable to suspect that a drug dealer would make notes relating to customers and suppliers. But when Jurgens searched Johnson's wallet, he only had probable cause to believe that she was guilty of drug possession—that is, possession for personal use. Arguably, it is not so obvious that when a person is arrested for possession of drugs for personal use, the papers in their wallet could be expected to shed light on whether they are guilty of drug possession.

Nevertheless, when a person is arrested for drug possession, the papers on their person may contain notations identifying the source of the drugs—a name, an address, or a telephone or pager number—or identifying the price that was paid for the drugs. Such

27. 20 P.3d 1115, 1119–1120 (Alaska 2001).

information would be evidence relating to the crime for which the person has been arrested. Because of this, we conclude that it was reasonable for Jurgens to examine the folded paper in Johnson's wallet. Our conclusion is buttressed by the fact that in *Middleton*, and more recently in *State v. Joubert*[27], our supreme court has demonstrated a willingness to countenance a certain amount of speculation as to the locations where evidence of a crime might be found during a search incident to arrest.

For these reasons, we conclude that Jurgens acted lawfully when he opened and inspected the folded piece of paper in Johnson's wallet.

*Conclusion*

The judgement of the superior court is AFFIRMED.