NOTICE

*The text of this opinion can be corrected before the opinion is published in the* Pacific Reporter. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

JACKLYN GOSUK,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-12749
Trial Court No. 3DI-15-00359 CR

O P I N I O N

No. 2696 — March 26, 2021

Appeal from the Superior Court, Third Judicial District, Dillingham, Patricia P. Douglass, Judge.

Appearances: Joseph R. Faith, Attorney at Law, Dillingham, under contract with the Office of Public Advocacy, Anchorage, for the Appellant. Michal Stryszak, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge WOLLENBERG.

In October 2015, Jacklyn Gosuk was traveling from Dillingham to Togiak when an Alaska State Trooper approached her at the Dillingham airport. The trooper had received a tip that Gosuk was transporting alcohol to Togiak, a local option community

that has banned the sale, importation, and possession of alcohol.[1]  Following an interaction with Gosuk outside the airport, the trooper removed Gosuk's luggage — a plastic tote container — from the airplane, searched it, and discovered twenty-five bottles of alcohol.  The State charged Gosuk with the offense of importing alcohol into a local option area.[2]

Gosuk moved to suppress all evidence seized at the airport, arguing that the trooper had subjected her to an unlawful investigative stop and impermissibly seized and searched her luggage.  Following an evidentiary hearing, the court denied Gosuk's motion to suppress, concluding that, *inter alia*, the interaction between Gosuk and the trooper was not a seizure for Fourth Amendment purposes and that Gosuk had given valid consent to the trooper to search her tote.

Gosuk ultimately pleaded guilty to the importation charge, reserving the right to appeal the denial of her motion to suppress under *Cooksey v. State*.[3]

On appeal, Gosuk challenges the superior court's denial of her motion to suppress.  Gosuk renews her arguments that the trooper conducted an unlawful investigative stop when he contacted her at the airport, and that he conducted an unlawful search and seizure when he examined the contents of her tote.

_____

[1]  *See* AS 04.11.491 (allowing local residents to hold an election to determine if the sale, importation, and possession of alcohol will be prohibited in the community); Alcohol & Marijuana Control Office, *Schedule of Local Option Communities* (Oct. 2020), Alaska Dep't of Com., Cmty. & Econ. Dev., https://www.commerce.alaska.gov/web/Portals/9/pub/ABC/DryDampCommunities/Local Option10152020.pdf.

[2]  AS 04.11.499(a) (prohibiting a person from knowingly sending, transporting, or bringing an alcoholic beverage into a municipality or established village that has voted to prohibit the importation of alcoholic beverages).

[3]  *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974).

After reviewing the record, we agree with the superior court that Gosuk was not subjected to an investigative stop when the trooper *initially* spoke with her outside the airport. We are concerned, however, that the court did not expressly consider whether the persistent nature of the trooper's accusatory questioning subsequently transformed the encounter into an investigative stop.

In any event, we ultimately conclude that the court's finding that Gosuk validly consented to the search of her tote rests, in part, on several factual findings that are not supported by the record. We therefore must remand Gosuk's case to the superior court to reconsider whether she voluntarily consented to the search of her tote.

On remand, because of the close factual overlap between these two issues — the nature of the stop and the voluntariness of Gosuk's consent — the court should also reconsider whether the encounter between the trooper and Gosuk ever ripened into an investigative stop.

*Underlying facts and litigation of the suppression motion*

The following facts are based on the evidentiary hearing on Gosuk's motion to suppress.

On October 13, 2015, Alaska State Trooper Mark Eldridge went to the Dillingham airport to investigate a tip that Gosuk was transporting alcohol to Togiak, a local option community. Eldridge identified Gosuk inside the airport terminal, and he asked her, "[D]o you think I could talk to you for a second?" Eldridge was dressed in full police uniform, but he did not touch Gosuk, or take her identification or plane ticket. Eldridge was familiar with Gosuk from assisting her in a prior incident.

Eldridge and Gosuk stepped outside the terminal to speak. Eldridge and Gosuk stood on the front steps leading into the airport terminal, with Gosuk remaining

"at an elevated position" and Eldridge on the ground below her. The two were standing at what Eldridge described as a "normal conversational distance."

The conversation between Eldridge and Gosuk was recorded, and the audio was admitted as an exhibit and played for the court at the evidentiary hearing.

When Eldridge began questioning Gosuk, he told her that she did not have to speak to him. He then asked, "Do you mind if I ask you a couple of questions? You don't have to talk to me." Gosuk responded, "Yes" (which Eldridge interpreted as granting him permission to talk with her).

Eldridge told Gosuk that he had heard that she may be bringing alcohol to Togiak, and he asked her whether there was any truth to that. Gosuk said, "No."

Eldridge then asked Gosuk if he could check her luggage to confirm whether or not she had any alcohol — but he also told her that she did not have to let him. Eldridge explained that "any time that we can dispel these rumors, it just makes life easier on us." Eldridge also added that, even if he found alcohol in her luggage, he would not arrest her that day and would instead seize the alcohol and "deal with it later on." Eldridge reiterated that Gosuk did not have to talk with him and did not have to let him search her luggage, but he also noted the past assistance he had provided to Gosuk:

> You and I have always had a pretty good relationship. I know we've talked before. So, I think there's a bit of a trust that you and I have there. I know I've helped your little girl out before. So I was just wondering. I mean, is there any alcohol in there?

Gosuk again responded, "No." Eldridge asked Gosuk a third time, "There's no alcohol in there?" And again, Gosuk said, "No alcohol."

For the next several minutes, Eldridge repeatedly sought permission from Gosuk to search her luggage, asking multiple times, "Would you mind if we took a look?" Gosuk never answered that question directly. But she continued to repeatedly

deny having any alcohol, and told Eldridge that her tote contained winter clothes and winter boots. The following portion of the conversation is representative of the larger exchange:

> *Eldridge*: . . . Would you mind if we took a look? And it's okay if you tell me that there's alcohol in there. Again, I'm not going to make a big spectacle of it either.

> *Gosuk*: There is no alcohol.

> *Eldridge*: Okay. Would you mind if we looked? If we looked in there? Is there any other type of drugs or anything like that you shouldn't be bringing out there?

> *Gosuk*: No.

> *Eldridge*: No? Okay, I mean, would you mind? Again, it's up to you. You wouldn't mind?

> *Gosuk*: It's all winter boots.

Eldridge then asked again, "Would you mind if we just took a look real quick?" Gosuk responded, "Yes." (Eldridge testified that, at this point, he believed Gosuk was granting him permission to search her tote.) Eldridge then said, "So that's okay?" But the transcript and the recording reflect no audible response by Gosuk.

Eldridge then said, "Okay. Here, why don't you come on with me?" Eldridge and Gosuk then proceeded to the airplane. After opening the rear cargo door of the plane, Eldridge asked Gosuk to identify her tote among the other items in the plane. Eldridge lifted the tote out of the plane and set it on the ground, and he asked Gosuk one more time, "And again . . . you don't mind if I [take] a look, right?" Gosuk replied, "Uhn-uhn (negative)."

Eldridge then proceeded to search the tote. In the tote, Eldridge discovered and confiscated twenty-five bottles of alcohol. At the end of the interaction, Eldridge asked, "[I]s there anything I said or anything like that to make you say what you did?"

Gosuk responded, "No." Eldridge followed up with, "This was all okay? You allowed me to look in there? You understand you didn't have to talk to me?" Gosuk replied, "Yes."

The court denied Gosuk's motion to suppress. The court concluded that the interaction between Eldridge and Gosuk was a lawful police-citizen contact and not an investigative stop (and therefore did not require reasonable suspicion of imminent danger or recent serious harm).[4] The court further found that Gosuk had voluntarily consented to the search of her tote and therefore a search warrant was not required.

Following the court's denial of her motion to suppress, Gosuk pleaded guilty, reserving the right to appeal the denial of her motion to suppress.

This appeal followed.

*Whether Gosuk was subjected to an investigative stop*

Gosuk first argues that the superior court erred in concluding that her interaction with Trooper Eldridge was a consensual police-citizen encounter and not an investigative stop requiring reasonable suspicion.

The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Alaska Constitution guarantee the right of citizens to be free from unreasonable searches and seizures. Under Alaska law, before an officer can subject a person to an investigative stop, the officer must have reasonable suspicion "that

---

[4] *See Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976) (holding that an officer may conduct an investigative stop only if the officer has "reasonable suspicion that imminent public danger exists or serious harm to persons or property has recently occurred").

imminent public danger exists or [that] serious harm to persons or property has recently occurred."[5]

However, not every contact between a police officer and a private citizen involves a "seizure" that triggers these protections.[6] Our case law draws a distinction between investigative stops (which constitute seizures for constitutional purposes) and police-citizen contacts in which the police merely seek information without engaging in a show of authority. We have said that "an officer does not conduct an investigative stop 'by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen.'"[7] In contrast, an officer does engage in an investigative stop when a reasonable person subject to the encounter would not feel free to leave.[8]

It is clear, under our case law, that Eldridge's initial approach and conversation with Gosuk outside the airport did not amount to an investigative stop. As the court found, Eldridge approached Gosuk in a public place, and he was the only officer present during the encounter. Although Eldridge asked Gosuk about the report that she was carrying alcohol, the mere recitation of his suspicion did not convert the

---

[5] *Id.*

[6] *Waring v. State*, 670 P.2d 357, 363 (Alaska 1983) (citing *Florida v. Royer*, 460 U.S. 491, 497 (1983)).

[7] *Cofey v. State*, 216 P.3d 564, 566 (Alaska App. 2009) (quoting *Waring*, 670 P.2d at 363) (alteration in *Cofey*); *see also Adams v. State*, 103 P.3d 908, 910 (Alaska App. 2004) ("A police officer can approach a private citizen and direct questions to that person without turning the encounter into an investigative stop.").

[8] *Waring*, 670 P.2d at 364; *Cofey*, 216 P.3d at 566.

stop into a seizure,[9] especially since Eldridge told Gosuk several times that she did not have to speak with him. Eldridge was in full uniform, but he did not display any weapons during the encounter nor did he block Gosuk from leaving the conversation and returning to the terminal. Given these findings, which are supported by the record, we conclude that the initial portion of the encounter between Eldridge and Gosuk did not constitute an investigative stop.

It is less clear, however, whether the encounter ever ripened into an investigative stop.[10] As a general matter, questioning that is designed to elicit an incriminating response does not, standing alone, automatically convert an otherwise consensual encounter into a seizure.[11] But the accusatorial nature of an officer's questions is one factor for a court to consider in evaluating whether a reasonable person would have felt free to leave.[12]

---

[9] *See, e.g.*, *Wright v. State*, 795 P.2d 812, 814-15 (Alaska App. 1990) (concluding that the encounter between the trooper and the defendant in a public place did not constitute a seizure, despite the trooper's inquiry as to whether the defendant's luggage contained drugs and subsequent request to search the luggage); *LeMense v. State*, 754 P.2d 268, 273 (Alaska App. 1988) (concluding that the trooper was entitled to approach the defendant and inquire whether the defendant's suitcase held drugs without converting the encounter into an investigative stop).

[10] *See I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (recognizing that "an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment").

[11] *Id.* at 216 (noting that "police questioning, by itself, is unlikely to result in a Fourth Amendment violation . . . [u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave had he not responded").

[12] *See* 4 Wayne R. LaFave, *Search and Seizure* § 9.4(a), at 607 (6th ed. 2020) (collecting cases); *see also State v. Alverez*, 147 P.3d 425, 431 (Utah 2006) (concluding that "the manner

(continued...)

Here, Gosuk argues that, in the face of Eldridge's persistent questioning — and in particular, his repeated posing of the same accusatory question — a reasonable person would not have felt free to leave. In essence, she contends that, even if the initial encounter between Eldridge and Gosuk did not constitute an investigative stop, Eldridge's refusal to accept Gosuk's repeated assertions that she did not have alcohol in her tote converted the interaction into a seizure.

There is support for Gosuk's position in other jurisdictions. For example, in *Gordon v. United States*, the District of Columbia Court of Appeals held that an officer's repeated questioning of the defendant about his identity, lasting ten minutes, converted the initial encounter into a seizure, notwithstanding the officer's calm and conversational manner.[13] In *State v. Thomas*, the Kansas Supreme Court held that the officer's repeated questioning of the defendant about whether she had recently used or was currently in possession of drugs, despite the defendant's denials, was a factor to be considered in analyzing whether the encounter was an investigative seizure.[14] And in *United States v. Little*, the Tenth Circuit stated that "[a]ccusatory, persistent, and intrusive questioning can turn an otherwise voluntary encounter into a coercive one."[15]

---

[12] (...continued)
of questioning, the content of the questions, and the context in which the questions are being asked can convert 'mere questioning' into a . . . seizure if, under all of the circumstances, a reasonable person would not feel free to leave").

[13] *Gordon v. United States*, 120 A.3d 73, 79-81 (D.C. 2015).

[14] *State v. Thomas*, 246 P.3d 678, 685-87 (Kan. 2011); *see State v. Hogan*, 252 P.3d 627, 634 (Kan. App. 2011) (noting, in reliance on *Thomas*, that "repeated questions, which persist despite repeated denials of culpability, can be considered in determining whether an encounter is voluntary").

[15] *United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995) (internal quotations omitted); (continued...)

These cases rest on the idea — articulated by the United States Supreme Court in *Florida v. Bostick* — that a reasonable person subject to repeated accusatory questioning may not feel free to leave until the inquiring officer is satisfied.[16]

Here, the superior court found, as a general matter, that Eldridge did not engage in conduct that would have been threatening or offensive if he had been a private citizen.[17] But the court did not expressly consider the persistent nature of Eldridge's accusatory questioning.

Typically, we would be required to view the record in the light most favorable to upholding the court's ruling.[18] But as we explain below, we conclude that a remand is necessary for the superior court to reconsider whether Gosuk validly consented to the search of her tote. Because there is factual overlap between these two

_____

(...continued)

*see also Commonwealth v. Sierra*, 723 A.2d 644, 646-47 (Pa. 1999) (noting that the police officer's repetition of the same question, despite receiving a negative response, combined with other factors to create an investigative detention); *People v. Bloxson*, 517 N.W.2d 563, 567 (Mich. App. 1994) ("The repetitive, potentially incriminating questions undoubtedly would lead a reasonable person to believe that he was less able to terminate the encounter."); *Lee v. State*, 2015 WL 5969453, at *9-10 (Md. Ct. Spec. App. July 31, 2015) (unpublished) (holding that an initially consensual encounter rapidly transformed into a seizure, "most importantly" because the officer repeated the same accusatory question even as the defendant indicated his unwillingness to participate in the inquiry).

[16] *Florida v. Bostick*, 501 U.S. 429, 435 (1991) (noting that officers "may generally ask questions of [an] individual . . . as long as the police do not convey a message that compliance with their requests is required").

[17] *See Waring v. State*, 670 P.2d 357, 364 (Alaska 1983) (recognizing that the key question in determining whether a police-citizen encounter amounts to a seizure is whether the officer has "conducted himself in a manner consistent with what would be viewed as non-offensive contact if it occurred between two ordinary citizens" (internal quotations and citation omitted)).

[18] *Baxter v. State*, 77 P.3d 19, 23 (Alaska App. 2003).

issues — namely, whether the persistent nature of the trooper's accusatory questioning affected the nature of the stop or the voluntariness of Gosuk's consent — we conclude that it is appropriate to allow the superior court in the first instance to reconsider whether the encounter between Eldridge and Gosuk ever ripened into an investigative stop.

*Whether Gosuk voluntarily consented to the search of her tote*

Gosuk also argues that the State failed to establish that she voluntarily consented to the search of her tote. We agree that the superior court's finding that Gosuk validly consented to the search of her tote rests, in part, on several factual findings that are not supported by the record.[19]

First, the court found that — over the course of the interaction between Eldridge and Gosuk — Gosuk nodded her head affirmatively five times. The court specifically relied on two of Gosuk's purported head nods in finding that Gosuk consented to the search of her tote.

But Eldridge never testified that Gosuk nodded her head in agreement at these junctures, and the audio recording does not reflect this non-verbal communication. The source of this information appears to be the prosecutor's assertions in the State's opposition to Gosuk's motion to suppress, rather than any evidence presented at the evidentiary hearing.

On appeal, the State acknowledges that the evidentiary basis for the court's findings that Gosuk nodded her head is "not readily apparent." We have reviewed the

---

[19] *Murray v. State*, 12 P.3d 784, 789 (Alaska App. 2000) ("Whether a defendant consented to a search is a question of fact to be determined by the trial court from the totality of the circumstances in each case. We must accept the superior court's findings on consent unless they are clearly erroneous.").

record, and we conclude that the court's findings that Gosuk nodded her head on these occasions are clearly erroneous.

Second, the court's finding that Gosuk gave a *verbal* consent of "Yes" in response to one of Trooper Eldridge's questions is unsupported by the record. Here is the pertinent portion of the court's order, in which the court recounted the critical moments supporting Eldridge's contention that Gosuk consented to the search:

> Here, Trooper Eldridge asked, "Would you mind if we took a look real quick? We can just pop it open, take a look, and I'll be out of your hair. It's up to you. We won't do it in front of anybody either." Ms. Gosuk then **nodded her head** and said, "Yes." . . . Trooper Eldridge verified Ms. Gosuk's consent by immediately asking, "So that's okay?" and Ms. Gosuk again **nodded her head** and said, **"Yes."** (Emphasis added.)

As we previously noted, there is no evidentiary basis for these two head nods. Additionally, both the transcript and the audio recording reflect that Gosuk's verbal response to Eldridge's question, "So that's okay?," was inaudible — not "Yes," as the court found. And Eldridge did not testify that Gosuk nodded her head or said "Yes" in response to that question. Accordingly, the court's finding that Gosuk provided verbal assent in response to Eldridge's question — "So that's okay?" — is not supported by the record.

Third, the court specifically found that, after the trooper and Gosuk went out to the airplane, Gosuk nodded her head at a moment when Eldridge testified that she actually shook her head and said, "No." After Eldridge removed Gosuk's tote from the airplane, he asked her, "[Y]ou don't mind if I [take] a look, right? . . . [Y]ou don't mind?" The transcript shows that Gosuk responded, "Uhn-uhn (negative)," and Eldridge confirmed that was his understanding. But the court said that Gosuk actually nodded her

head and responded "Mmhmm" — a finding that would seemingly *undermine* a finding of consent.

Given these erroneous findings, Gosuk asks us to reverse the superior court's denial of her motion to suppress. In response, the State suggests that, to the extent we are unable to determine whether the court's errors affected its finding that Gosuk gave unequivocal consent, we should remand this matter for further findings and an additional evidentiary hearing, if necessary. We conclude that a remand for further proceedings is appropriate.

When the State relies on the consent exception to the warrant requirement, the State has the burden to prove both that the defendant actually consented and that this consent was voluntary — *i.e.*, unequivocal, specific, and intelligently given, and uncontaminated by duress or coercion.[20] In other words, acquiescence is not the same as freely given consent, and the State bears the burden of proving that the consent was untainted by any implicit threats or subtle coercion that may have existed under the circumstances.[21]

Here, Gosuk contends that she did not consent, and that in any event, any purported consent that she gave was involuntary. In particular, Gosuk argues that the

---

[20] *Gieffels v. State*, 590 P.2d 55, 62 (Alaska 1979); *Schaffer v. State*, 988 P.2d 610, 613 (Alaska App. 1999) (citing *Erickson v. State*, 507 P.2d 508, 515 (Alaska 1973)).

[21] *See Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (holding that a State's burden to prove voluntary consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"); *United States v. Berry*, 670 F.2d 583, 596 (5th Cir. 1982) (emphasizing that "acquiescence cannot . . . substitute for free consent" and acknowledging the potential "implicit threats or subtle coercion" that can occur in an airport setting); *Schaffer*, 988 P.2d at 615-16 (distinguishing between voluntary, uncoerced consent and mere acquiescence to apparent lawful authority, and holding that the defendant's assent for airport security to search her carry-on luggage was nothing more than acquiescence to apparent lawful authority).

phrasing of Eldridge's repeated requests to search (*e.g.*, "Would you mind if we took a look?" or "You wouldn't mind?") led to ambiguous answers that did not indicate "unequivocal, specific, and intelligently given consent."

Gosuk's concern is well-taken. As a judge of this Court has previously noted, questions phrased in the form of "Do you mind if . . ." may be "a clever investigative technique," but the ambiguity of the defendant's response may inhibit the State's ability to prove "the *unequivocal* consent that the law requires."[22]

Gosuk also points to the trooper's multiple requests to search and again argues (as she did in the investigative stop context) that the repeated nature of the requests to search were coercive, particularly in the face of Gosuk's repeated denial of any wrongdoing. We agree with Gosuk that her denials of wrongdoing and the trooper's repeated requests to search are factors that should be considered by the superior court on remand.[23] As the Supreme Court has noted, a request for consent to search does not automatically convert a consensual encounter into a seizure "as long as the police do not convey a message that compliance with their request is required."[24] Likewise, the mere fact that a person was asked more than once to consent is not necessarily coercive by

---

[22] *Richmond v. State*, 2008 WL 1990646, at \*4 (Alaska App. May 7, 2008) (unpublished) (Mannheimer, J., concurring) (emphasis in original).

[23] *See State v. O'Neill*, 62 P.3d 489, 504 (Wash. 2003) (en banc) (noting that "[a] number of courts have found that repeatedly requesting consent is a factor to consider in assessing the voluntariness of consent"); *see also United States v. Raibley*, 243 F.3d 1069, 1076 (7th Cir. 2001) (including as a factor to be considered whether the consent was immediate or was prompted by repeated requests by the authorities); *People v. Cardenas*, 604 N.E.2d 953, 956 (Ill. App. 1992) (agreeing with other courts that "an initial refusal is an important factor in assessing whether a subsequent consent is voluntary").

[24] *Florida v. Bostick*, 501 U.S. 429, 435 (1991).

itself, but it may become coercive if the police persist in a manner "conveying that they would not take 'No' for an answer."[25]

In sum, given the superior court's clearly erroneous findings with regard to Gosuk's responses, we conclude that a remand is required so that the superior court can reconsider the question of consent in this case. On remand, the superior court shall take into account the totality of the circumstances that governed this interaction, including, but not limited to, the location and tone of the interaction, the ambiguous nature of the trooper's phrasing, the trooper's repeated requests for consent, and Gosuk's actual responses. The superior court shall then make findings regarding whether the State has met its burden of proving both that Gosuk consented to the search and that the consent was voluntary.

As we noted earlier, the court should also reconsider whether the trooper's interaction with Gosuk ever ripened into an investigative stop, and if so, whether the trooper possessed reasonable suspicion for the stop under *Coleman*.[26]

*Conclusion*

We VACATE the superior court's ruling denying Gosuk's motion to suppress, and we REMAND this case for further proceedings consistent with this decision. We are aware that the judge who originally presided over the evidentiary hearing is now retired, and it may be appropriate for the court to hold a new evidentiary hearing.

---

[25] 4 Wayne R. LaFave, *Search and Seizure* § 8.2(b), at 79 (6th ed. 2020) (citations and internal quotations omitted).

[26] Because the superior court concluded that Gosuk was not subjected to an investigative stop, the court never reached the question of whether any purported stop was supported by reasonable suspicion under *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976).

The superior court shall hold any hearing and transmit its findings and decision to this Court within 120 days of this opinion.  This deadline may be extended by the superior court for good cause and notification to this Court.

We retain jurisdiction.